**KRANJAC TRIPODI & PARTNERS LLP**
Xavier M. Bailliard (XB8980)
James Van Splinter (JV0258)
30 Wall Street, 12th Floor
New York, New York 10005
Tel: (917) 534-6127
Fax: (646) 216-2373
xbailliard@ktpllp.com
jvansplinter@ktpllp.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| OM 309-311 6TH STREET, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>THE CITY OF UNION CITY, UNION CITY RENT STABLIZATION BOARD AKA THE CITY OF UNION CITY RENT LEVELING BOARD, KENNEDY NG, NILDA MERCADO, ROSANNA COLON, NORMA GUEVARA, YAMIRYS HOLGUIN, SANDRA VASQUEZ, JUAN MILAN, NANCY JAFARGIAN, BOLIVAR CARDENAS, MICHAEL LOPEZ, HECTOR ROSARIO, MAYOR BRIAN P. STACK, JOHN V. SALIERNO, and NEIL D. MAROTTA,<br><br>Defendants. | Civil Action No.<br><br>**COMPLAINT** |

Plaintiff OM 309-311 6th Street, LLC ("Plaintiff"), by and through its attorneys, Kranjac Tripodi & Partners LLP, as and for its Complaint against the defendants alleges as follows:

**<u>INTRODUCTION</u>**

1.      Plaintiff brings this action under 42 U.S.C. § 1983, as a result of the shocking abusive acts of Defendants who, under color of law, engaged in a collective and coordinated

scheme to not only deprive Plaintiff of its right to collect legal rents from one of its tenants, but to also demand that Plaintiff reimburse a tenant for an improperly calculated overcharge of rent that had purportedly been charged to the tenant by a prior owner of Plaintiff's property.

2.      Through this shocking abuse of power set forth in detail below, Defendants knowingly and deliberately deprived Plaintiff of its constitutional rights to due process.

## **PARTIES**

3.      Plaintiff is a New Jersey limited liability company with its principal place of business located at 316 Eisenhower Parkway, Livingston, New Jersey 07039.

4.      Plaintiff is currently the owner of the property located at 309-311 Sixth Street, Union City (the "Property").  The Property is located on the tax map of Union City at Block 25, Lot # 10.  The Property is a 41-unit apartment building.

5.      Defendant, the City of Union City (the "City"), is a municipal corporation and political subdivision of the State of New Jersey that has authorized the establishment of and has control over the actions of its agency, the City of Union City Rent Leveling Board.

6.      Defendant City of Union City Rent Leveling Board (the "Board") is a public entity with offices located at 3715 Palisade Avenue, Union City, New Jersey 07087.  The Board is a body of the City of Union City established pursuant to New Jersey law and Union City municipal ordinance and is empowered to execute, consistent with New Jersey law, Union City's rent control ordinance.  In this regard, the Board is statutorily tasked with, among other things, enforcing the City of Union City's rent stabilization ordinance.

7.      Defendant Mayor Brian P. Stack ("Mayor Stack") is charged with the duty to control, oversee, and regulate the administration and functions of the City.

2

8.      Defendant Kennedy Ng ("Ng") is the Rent Leveling Administrator of the City of Union City and is empowered, among other things, to accept and process complaints from tenants of illegal rental increases, to coordinate and supervise all staff associated with the operation of the Ordinance, to notify landlords that there is no record of compliance by the landlord with the provision of the Ordinance and to attend all meetings of the Rent Stabilization Board.

9.      Defendant Nilda Mercado ("Mercado") was the Secretary of the City of Union City Rent Leveling Board until 2020.

10.     Defendant Juan Milan ("Milan") is the Chairman of the City of Union City Rent Leveling Board and is empowered to determine legal rents and to adjudicate rent disputes pursuant to the Ordinance.

11.     Defendant Sandra Vasquez ("Vasquez") is the Vice Chairwoman of the City of Union City Rent Leveling Board and is empowered to determine legal rents and to adjudicate rent disputes pursuant to the Ordinance.

12.     Defendant Rosanna Colon ("Colon") is a member of the City of Union City Rent Leveling Board and is empowered to determine legal rents and to adjudicate rent disputes pursuant to the Ordinance.

13.     Defendant Nancy Jafargian ("Jafargian") is a member of the City of Union City Rent Leveling Board and is empowered to determine legal rents and to adjudicate rent disputes pursuant to the Ordinance.

14.     Defendant Hector Rosario ("Rosario") is a member of the City of Union City Rent Leveling Board and is empowered to determine legal rents and to adjudicate rent disputes pursuant to the Ordinance.

15.     Defendant Norma Guevara ("Guevara") is a member of the City of Union City Rent Leveling Board and is empowered to determine legal rents and to adjudicate rent disputes pursuant to the Ordinance.

16.     Defendant Yamirus Holguin ("Holguin") is a member of the City of Union City Rent Leveling Board and is empowered to determine legal rents and to adjudicate rent disputes pursuant to the Ordinance.

17.     Defendant Neil D. Marotta, Esq. ("Marotta") is the Attorney for the City of Union City Rent Leveling Board.

18.     Defendant John V. Salierno, Esq. ("Salierno") is the Tenant Advocate Attorney for the City of Union City.  The Tenant Advocate Attorney is charged with, among other things, "[giving] free advice and assistance to apartment dwellers in their dealings with the City Rent Stabilization Board and/or before any court or administrative tribunal as may be assigned by the appropriate official of the City."

## JURISDICTION AND VENUE

19.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because Counts One through Three of the Complaint arise under 42 U.S.C. § 1983.

20.     The Court has supplemental jurisdiction over the state law claim in Counts Four pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form the same case or controversy.

21.     Venue is proper under 28 U.S.C. § 1391(b) and (c) because all Defendants are subject to personal jurisdiction in the District of New Jersey and because a substantial part of the events or omissions that gave rise to this action occurred in the District of New Jersey.

## FACTUAL SUMMARY

22.     New Jersey is one of only four other states (New York, Maryland, Oregon and California) plus Washington, D.C., that imposes rent control.

23.     While some states enforce rent control statewide, New Jersey's rent control ordinances are enacted by municipalities.

24.     New Jersey adopted rent control in or around 1973.

25.     In or around that time, in 1973, Union City passed its first rent control ordinance ("Ordinance").   Among other drastic measures, the Ordinance established as of 1973 a base rent for all rent-controlled units in Union City.  Any permissible increase in the base rent amount under the Ordinance was to be calculated from that original 1973 base rent.

26.     In 1996, after having already adopted six (6) amendments to the Ordinance over the years, Union City adopted a seventh amended ordinance (the "1996 Ordinance").   Of particular import, the 1996 Ordinance contained an express and unambiguous de-control provision that allowed for a reestablishment and/or reset of the original base rent of 1973 (from which allowed increases were to be calculated) for any rent-controlled unit that became vacant subsequent to the adoption for the 1996 Ordinance.

27.     Specifically, the 1996 Ordinance provided that:

Existing tenants will continue to be protected by rent control while they remain in their units.  For these tenants, a landlord must still comply with the requirements of this chapter. All rents established by landlords and tenants on March 1, 1973, and any subsequent increase shall represent the base rent from which permitted increases are calculated.  **As to those units vacant at the time of the adoption of this chapter or which subsequently become vacant under the terms of this chapter, the rent agreed to by the landlord and tenant shall become the new base rent by which the permitted increases under this chapter shall be determined.**

*See* 1996 Ordinance at § 14-2(c) (emphasis added).

5

28.     In short, upon the vacancy of any unit subsequent to the 1996 Ordinance, a landlord was permitted to establish a new base rent for that unit upon agreement with the new tenant.  Any subsequent permitted increases under the 1996 Ordinance (or any subsequent amended ordinances) to the rental amount would be based upon that newly established base rent.

29.     In or around 1999, after the adoption of the 1996 Ordinance and before any amendments thereto, the tenant ("Tenant #1") residing in Unit 1B of the Property vacated the unit.

30.     At or around that same time, a new tenant ("Tenant #2") moved into the unit.

31.     Pursuant to the 1996 Ordinance, because Unit 1B became vacant after the adoption of the 1996 Ordinance, the new rent agreed to by the landlord and Tenant #2 became "the new base rent by which the permitted increases under this chapter shall be determined" and the original base rent established in 1973 ceased to be the operative base rent.  *See* 1996 Ordinance at § 14-2(c).

32.     At the time the new tenant moved into the vacated Unit 1B, the new base rent agreed to by the landlord/owner at the time and the new tenant equaled $487.33.

33.     As such, pursuant to § 14-2(c) of the 1996 Ordinance, $487.33 was, from then on, the new base rent for Unit 1B – the base rent was no longer the one established in 1973.

34.     In 2018, Plaintiff began negotiations to enter into a contract to purchase a portfolio of properties in Union City, including the Property.

35.     At the time, Union City had amended its rent control ordinance numerous time, and the then operative ordinance had been adopted in 2017 (the "2017 Ordinance").

36.     Pursuant to Section 334-14(E) of the 2017 Ordinance, prior to purchasing the portfolio of properties, including the Property, Plaintiff sought from the City rent registrations for each property (including the Property) from the Rent Control Office of Union City.

37.    Specifically, via OPRA request dated October 17, 2018 (and received by the City the same day), Plaintiff sought for each property in the proposed portfolio (including the Property): "Violations for zoning, building dept, city, fire dept or task force, unpaid fines or penalties" and "Rent registrations for past 3 years."

38.    On March 6, 2019, four months after receiving the OPRA request, the City finally provided a limited response to the OPRA request.

39.    Shortly thereafter, again in an attempt to comply with Section 334-14(E) of the 2017 Ordinance and to obtain the required rent calculation information for the Property prior to Plaintiff's purchase of the same, Plaintiff served the City with a second OPRA request seeking all documents in the City's records related to the Property.

40.    However, as was par with the City's course of dealing with Plaintiff, it failed to timely respond to the OPRA request.

41.    As a result, due to fixed closing deadlines set by the seller of the Property, Plaintiff had no choice but to move forward with the closing of the purchase of the Property on January 22, 2019.

42.    At the time of the purchase, Plaintiff had not been able to obtain the rent calculations for the Property due entirely to the City's own delay and ineptitude in responding to Plaintiff's repeated requests over the course of the proceeding months.

43.    On April 18, 2019, in a continued effort to cooperate with the City and comply with the 2017 Ordinance, Plaintiff met with Nilda Mercado of the Rent Leveling Board to discuss Plaintiff's acquisition of the Property, along with a number of other properties in Union City.  During this meeting, Plaintiff indicated that it had attempted to obtain rent registration documents for months from the City, but still had received none.  The next day, on April 19, 2019, Plaintiff provided Ms.

7

Mercado with a complete lists of all properties Plaintiff (and related entities) had purchased, all in an effort to have open communications with the Rent Leveling Board and to ensure that it complied with the 2017 Ordinance.

44.     Finally, on May 7, 2019, weeks after receiving the second OPRA request and after Plaintiff was forced to close on its purchase of the Property without the requested information, the City finally provided a response to Plaintiff's second OPRA request regarding the Property. Incredibly, however, the documents provided by the City were entirely non-responsive – they did not include any documents for the Property, but rather included records related to completely different properties.  In short, the City sat idle for weeks, waited until Plaintiff purchased the Property, and then provided non-responsive documents.

45.     In a continued effort to comply with the Ordinance and to proceed in good faith and to cooperate with the City,  Plaintiff immediately (also on May 7, 2019) informed the City that the documents were not related to the Property and were not responsive to the OPRA request.

46.     Plaintiff received no response from the City.  As such, on May 13, 2019, still in a continued effort to comply with Section 334-14(E) of the 2017 Ordinance, Plaintiff followed up with the City regarding its request for rent registrations for the Property.

47.     Again, Plaintiff received no response.  As such, yet again, on May 20, 2019, Plaintiff followed up with the City regarding its request for rent registrations for the Property.

48.     In response, the City merely stated, without any detail or estimate of the timeframe for the production of the documents, that it was "circling back with Rent Control" – nothing more.

49.     Two weeks later, Plaintiff had still received nothing from the City or the Rent Control Office.  As such, on June 4, 2019, and again in further attempt to comply with Section 334-14(E) of

the 2017 Ordinance, Plaintiff asked if the City had received any documents from the Rent Control Office regarding the rent registrations for the Property.

50.     Then, via letter dated August 30, 2019, Mercado informed Plaintiff that the current tenant in Unit 1B of the Property, Emilio Puente ("Puente"), who had lived in the Unit since  2014, had complained for the first time about his rent to the Rent Leveling Board and that, incredibly, as a result thereof, the City had unilaterally determined based on its faulty rent calculation that Puente had been overcharged $16,113.08 in past rent paid from February 2014 to June 2019, because the legal rent as arbitrarily calculated by Ms. Mercado was $764.72 in lieu of the correct legal rent of $996.05. Worse, even had the $764.72 been accurate—and it was not—Mercado improperly calculated the purported overcharge (i.e. by including an extra month).

51.     The Rent Leveling Board never contacted Plaintiff to inform it that Puente had made a complaint regarding his rent – this is because the City's Ordinance provides no duty to do so and effectively eliminates Plaintiff's ability to respond or seek information.   More, the Rent Leveling Board never notified Plaintiff that it was performing a recalculation of the legal base rent for Unit 1B – again this is because the City's Ordinance provides no duty to do so, which again eliminates Plaintiff's ability to respond before the new base rent is unilaterally and arbitrarily calculated.

52.     This deliberate failure to provide any notice to Plaintiff is part of Defendants' carefully crafted scheme by which they routinely deprive property owners' rights by unilaterally—and without any notice to the landlord—improperly and arbitrarily lower rents for tenants and then direct those tenants to immediately begin paying the lower rent (or no rent at all with the anticipation of a credit refund).

53.     Indeed, this letter was the first time that Plaintiff had been provided any notice that Puente had made a complaint to the Rent Leveling Board regarding his rent.  It was also the first time

9

that Plaintiff was provided notice that the Rent Leveling Board had performed a recalculation of the legal base rent. As such, Plaintiff was never given any opportunity to object to, appeal, or even review the documents upon which Mercado relied to reduce the purported legal base rent.

54.     More, as set forth above, this overcharge calculation by the Rent Leveling Board (and specifically Ms. Mercado) was inaccurate as it was based on an improper use of a legal determination of base rent from 1987 and not the new base rent established in 1999 when Unit 1B had been vacated and rented to a new tenant who had agreed to that new base rent.

55.     And more, in her letter, Ms. Mercado informed Plaintiff that it owed the entirety of this overcharge (dating back to 2014) and mandated that Plaintiff pay said overcharge within ten (10) days, even though Plaintiff had only purchased the Property in 2019. In so directing Plaintiff to pay this overcharge within ten (10) days, Ms. Mercado deliberately and knowingly prevented Plaintiff from exercising its right to appeal the overcharge calculation.

56.     In fact, Plaintiff would later discover via a response to an OPRA request it had sent to the Rent Leveling Board that, in June 2019, Mercado had mistakenly sent a letter of Puente's complaint and new base rent to the prior owner of the Property – even though, as set forth above, Mercado had met with Plaintiff in early 2019 and had been informed orally and in writing that Plaintiff was the current owner of the Property.

57.     As such, Plaintiff was arbitrarily and unfairly punished and deprived of its rights to respond to Puente's complaint and object to the new base rent calculation due to the City's own mistake, which it deliberately ignored.

58.     On September 6, 2019, and in shock after receiving Mercado's August 30, 2019 correspondence, Plaintiff emailed Mayor Stack, Marotta, Ng, and the Rent Leveling Board to notify them of the letter and its contents and its objection to the demand for the overcharge refund to Puente.

59.     On September 10, 2019, Marotta responded to Plaintiff via an email copied to Mayor Stack and Ng.  In that email, Marotta first admitted that the City's June 18 2019 correspondence had been sent to the prior owner.  Incredibly, though, Marotta blamed this mistake on the fact that the City purportedly had only the prior owner's address on file, despite the fact that Plaintiff had not only met with Mercado on April 17, 2019 to inform her of Plaintiff's purchase of the Property, but also sent her the day after (April 18, 2019) a list of all of the properties that they had acquired, including the Property!

60.     In addition, in his September 10, 2019 email, Marotta further attempted to place the blame on Plaintiff for Mercado's mistake in sending her letter to the wrong address on the purported fact that Plaintiff had purportedly failed to "follow[ ] the ordinance and register[ ] timely."  However, as set forth above, the failure to register timely fell squarely on the Rent Leveling Board's and City's failure to respond properly and timely to Plaintiff's OPRA requests that had been submitted prior to Plaintiff's purchase of the Property.  In addition, Marotta's attempted placement of blame on Plaintiff was even more astounding since Plaintiff had previously met with Marotta and Ng to discuss filing the registration statements at a later date.

61.     By letter dated September 10, 2019, Plaintiff informed the Rent Leveling Board and Mercado that her August 30, 2019 correspondence was the first time Plaintiff had been informed of any legal rent calculation or overcharge for the tenant – let alone that the Puente had complained to the Rent Leveling Board regarding his rent.  Plaintiff further disputed the rent calculation on the grounds that it was improperly based on a legal determination of base rent from 1987 (and not the new rent established under the 1996 Ordinance when the unit was vacated and a new rent was agreed upon by the new tenant that subsequently moved into the unit in 1999) and thus appealed the faulty rent calculation to the Rent Leveling Board.

62.     Then, on September 13, 2019, Plaintiff responded to Marotta's September 10, 2019 email setting forth the lengthy history of the City's repeated delays and failure to provide information to Plaintiff prior to the purchase and failure to properly advise Plaintiff of the registration requirements, even though Plaintiff had been in constant communication with the City (and had even had meetings with Mercado).

63.     Unsurprisingly, Plaintiff received no response – because the City had no viable response or explanation to give.

64.     Instead, two months later, via letter dated December 12, 2019, yet again based on an improper legal determination of base rent from 1987, and arbitrarily disregarding the fact that the base rent had been reset under the 1997 Ordinance in 1999 when the unit had been vacated, the Rent Leveling Board and Mercado formally informed Plaintiff that as of October 1, 2019, the legal rent for Unit 1B was reduced to $764.73.

65.     Plaintiff thereafter timely appealed the rent recalculation (the "First Appeal").

66.     On February 10, 2020, the Board held a hearing (the "First Hearing") on Plaintiff's First Appeal.

67.     Present at the First Appeal were: Ng, Mercado, Marotta, Colon, Jafargian, Rosario, Vasquez, Milan, and Salierno.

68.     At the hearing, Plaintiff provided both testimony and documentary evidence (via rent registration statements from the City's own records) showing that the tenant in Unit 1B had changed in 1999 – and thus, necessarily that Unit 1B had been vacated prior to the new tenant moving in,

69.     As such, Plaintiff argued that under the applicable ordinance at the time (the "1996 Ordinance"), the base rent for Unit 1B was reset to the rent amount agreed to by the owner at the time

and the new tenant, named Mr. Zambrano, – in May 1999 – and the prior base rent was no longer applicable.

70.    Plaintiff further demonstrated that the new base rent for Unit 1B, which was agreed to by the owner and the new tenant, Mr. Zambrano, equaled $463.86.   This was evidenced by a comparison of the rent registrations for that period – again, which was in the City's files, and which showed a change in the tenant for Unit 1B in 1999.

71.    Plaintiff then testified that it had calculated the rent as of October 2019 as $904.23 (due to permitted yearly increases under the applicable ordinances) from that new base rent (as set forth in the 1996 Ordinance) and introduced at the hearing documentary evidence of that calculation.

72.    In response, Salierno, as Tenant Advocate on behalf of Puente, asked if Plaintiff was in possession of the lease that had been entered by the new tenant in 1999.  Obviously, since Plaintiff did not purchase the Property until ten (10) years later, Plaintiff could not have had those records. This was especially the case since the Property had been previously owned by at least three different owners.  More, prior to Plaintiff purchasing the Property, it was routine practice (and considered legal by the State of New Jersey) for landlords to enter into oral month to month leases with tenants – in those cases, it would be impossible to obtain a copy of a non-existent document.

73.    In fact, Salierno's inquiry was disingenuous, since to require a potential owner to somehow obtain a copy of a written lease for every single unit in every single property they purchase from a prior owner (who themselves may have purchased the property from an even prior owner), from the date those properties were built (no matter how long ago) would be entirely overly burdensome, if not impossible.   To place that kind of burden on a landlord would be beyond onerous, especially where an owner **and** the City have the benefit of the rent registration statements filed by the prior owners.   Nonetheless, Salierno argued that burden should be imposed upon Plaintiff.

74.     Plaintiff responded that it relied on the only documented records available, which were in the City's files, i.e. the rent registration statements.  As set forth above, it would have been impossible for Plaintiff to have obtained copies of written leases for every single past tenant of the Property.

75.     In response, Marotta stepped in and attempted to discount the City's own records (i.e. the rent registration statements) on the grounds that without an actual lease, there was no evidence of a meeting of the minds between Mr. Zambrano and the prior owner.  This was immediately countered by Plaintiff in demonstrating that Mr. Zambrano had remained a tenant in Unit 1B for 13 years, until 2012, which necessarily showed a meeting of the minds by the parties' course of conduct.

76.     The Board ignored this reasoning without any basis.

77.     In fact, nothing in the 1996 Ordinance states that a vacancy and agreed upon new rent must be proven via only a lease.  In fact, it could not, since many landlords routinely entered into oral month to month leases with tenants.

78.     Mercado, the secretary of the Rent Leveling Board who had performed the rent recalculation, then testified.  While she acknowledged that the rent registration statements relied on by Plaintiff showed a change in the tenant for Unit 1B in 1999, she unilaterally chose to disregard the statements on the grounds that she believed that, at times, some rent registration statements may contain mistakes.  However, she did not testify that she was aware of any mistakes on the rent registration statements provided by Plaintiff showing the change in tenancy at the Unit.   In addition, she testified that in lieu of relying on signed, completed, and filed registration statements, she preferred to rely on unsworn, informal letters that might be in the City's records.

79.     Mercado's testimony and reasoning for refusing to consider Plaintiff's documentary evidence available was entirely arbitrary and knowingly disingenuous.  Indeed, pursuant to Section

334-16 of City's current Ordinance, owners are required to register their tenants/rents via a rent registration statement. In setting forth this requirement, the City necessarily acknowledges and concedes that the information on a rent registration statement is valid and provides sufficient evidence of, among other things, (i) the occupant of a unit (*see* § 334-16(1)(a)) and (ii) the current rent for the unit (*see* § 334-16(1)(c)). In fact, the City had accepted, checked, and relied upon the information contained in the rent registrations for the Property for twenty-five (25 years).

80. However, apparently, pursuant to Mercado's testimony, the City has full and complete arbitrary discretion as to when it chooses to rely on registration statements (e.g. when it benefits the City) or when to reject information on a registration statement (e.g. when it favors a landlord). This was made all the more apparent by the fact that Mercado had calculated the lowered rent based upon a rent amount she had extrapolated from an August 21, 1987 letter that she had located in the Rent Leveling Board's records that apparently noted the rent amount for the unit at the time.

81. After hearing testimony and argument, the Board, via Milan, first stated that he was not sure how to rule and that "I can see going either way and usually I hate when I am tentative about a decision." He then held as follows:

> . . . we leave the rent as the administrators have set based on the fact I don't have a lease or rent or anything but because I can see that there is ambiguity in landlord in good faith could have been somewhat confused on this, if there is any arrears or any overcharges that might be due, I will say they should be waived.

82. Salierno, who, as Tenant Advocate, was acting as counsel for Puente, did not express any disagreement and did not state any objection to that decision.

83. Marotta also did not object to the decision. Instead, he went out of his way to recognize that "the ordinance does give some pretty broad powers to the board" but that 'It doesn't specifically say waive an overcharge . . [.]"

15

84.     In stating as much, Marotta acknowledged that he had access to the applicable ordinance and that nothing in the ordinance prevented the Board from waiving any overcharges.

85.     Milan then again reiterated:

We uphold the decision of the administrators but because of the ambiguity regarding what constitutes proof especially since it's a new landlord who was not there at the time when originally these decisions were made, that there won't be any, overcharges will be waived.

86.     Board members Rosario, Jafargian, Vasquez, Colon, and Milan then all confirmed their agreement with that decision.

87.     Puente was present throughout the entirety of the First Hearing, and had an interpreter. As such, Puente understood the testimony presented at the First Hearing, and certainly understood the Board's decision to waive the overcharge.

88.     On July 13, 2020, five months after the First Hearing, the Board finally entered its resolution (the "First Resolution") regarding Plaintiff's First appeal.  In the Resolution, the Board incredibly (i) failed to recite that Plaintiff had produced evidence that Unit 1B had been vacated via rent registration statements on file at the Rent Leveling Board that unequivocally showed a change in the tenant of Unit 1B in 1999 (and thus that the only basic, good faith, logical conclusion that Unit 1B was vacated by the previous tenant), and (ii) that it instead relied exclusively on Mercado's testimony that she had deliberately and arbitrarily ignored the rent registration statements showing a vacancy in Unit 1B in 1999 (and thus used the wrong base rent in lieu of the newly established base rent in 1999) simply because she personally believed that rent registration statements are "often inaccurate."  Even worse, the Board made no finding in the First Resolution that the rent registration statements offered by Plaintiff were actually inaccurate in any way.

89.     In short, the Board, in its Resolution, memorialized that it rejected documentary evidence of a vacancy in 1999 on the sole fact that the secretary of the Rent Leveling Board said that,

because some unspecified registration statements may not always accurate, then not one single registration statement (even those not actually demonstrated to be inaccurate) can be relied upon by a landlord for purposes of resetting the legal base rent (and, instead, the City could rely on some letter in its file to an unspecified tenant from 1987 to set the base rent).  In so doing, the Board therefore arbitrary, capriciously and unreasonable ignored relevant information in its First Resolution.

90.     Based upon these findings, the Board upheld Mercado's rent determination of $764.73.  However, tacitly acknowledging that this decision was improper and contrary to the 1997 Ordinance, the Board further expressly stated that "due to an ambiguity as to what constitutes proof [of a vacancy] especially for a new landlord, any overcharges that might be due, are waived."

91.     A week later, on July 20, 2020, Mercado served Plaintiff's attorney **and** Salierno with the First Resolution, via email sent to Plaintiff's email address and Salierno's email address (johnsaliernolegal@gmail.com).

92.     Pursuant to the then-current Ordinance (adopted in 2019) at § 334-8:

Either the landlord or the tenant may appeal the decision of the Rent Stabilization Board.  All decision of the Board are final.  Any landlord or tenant wishing to appeal the decisions of the Board may do so in the Superior Court of New Jersey pursuant to its rules and procedures.

93.     Pursuant to New Jersey Court Rule 4:69-6, an appeal of a Board decision "shall [not] be commenced **later than 45 days** after the accrual of the right to review, hearing or relief claimed[.]" (Emphasis added).

94.     As such, Plaintiff and Salierno, the Tenant Advocate, were required (without exception provided in the rules) to file an appeal of the First Resolution within 45 days of July 20, 2020, **or by September 3, 2020**.

95.     Although Plaintiff vehemently disagreed with the Board's adoption of Mercado's deliberate ignorance of the documentary evidence showing a vacancy in Unit 1B in 1999 and thus

improper rent calculation, it made a financial and strategic decision to not appeal the First Resolution since the Board had expressly stated that no overcharges would be due Puente.

96.     Incredibly, on September 30, 2020, (i) almost eight (8) months after the Board had already decided at the February 10, 2020 hearing that Plaintiff need not pay any overcharge to Puente, (ii) two and half months after the Board had entered its formal Resolution, which expressly stated that Plaintiff need not pay any overcharge to Puente, and (iii) almost two and half months after Salierno had received a copy of the Resolution, Salierno unilaterally notified Plaintiff that "[on] August 30, 2019, the secretary of the Rent Leveling Board . . . determined that, based on her calculation of the legal rent, Mr. Puente overpaid in rent in the amount of $16,113.08" and that "Puente hereby elects to credit that amount against future rent."

97.     As set forth above, not only was the purported rent calculation improper as it relied on a legal determination of base rent from 1987 and continued to deliberately ignore that the base rent had been reset in 1999, but Salierno knowingly and directly contradicted the Board's decision and First Resolution.

98.     Via letter dated October 2, 2020, Plaintiff reminded Salierno of the First Resolution, and particularly that it expressly stated that any overcharges were waived.  Plaintiff further reiterated that although the rent calculation adopted by the Board was improper (as evidenced by the rent registration statements produced at the First Hearing), it had made the strategic decision to not appeal the decision.  Plaintiff thus requested that Salierno comply with the Board's First Resolution and retract his September 30, 2020 notification.

99.     Over the course of the next month, Plaintiff followed up several times with Salierno and explained that Puente had failed to pay rent for a number of months.  Salierno had evidently directed Puente to cease paying the rent – since he had informed Plaintiff in his September 30, 2020

letter that Puente had elected to take a credit in the amount of the purported overcharge towards future rent.

100.    Finally, on November 16, 2020, despite Plaintiff's repeated requests for a response, and even though Salierno knew that the Board's Resolution expressly stated that any overcharge would be waived, Salierno responded to Plaintiff.  In his response, Salierno confirmed that he had "explained everything" to Puente (including that the overcharge had been waived) and that he had instructed Puente to pay the back rent immediately.   However, this was false.

101.    Indeed, shockingly, on November 25, 2020, Salierno requested via letter to Marotta that the Board "reconsider its decision" that the overcharges be waived and to "hold the current owner liable for the refund."  In support thereof, Salierno cited to § 334-5(a)(3)(k) of the 2019 Ordinance that provides "… the Landlord shall refund to the Tenant the amount of the overcharge . . ." or  the tenant may "take the refund as a credit against future rent[.].

102.    Salierno and Marotta knew that Salierno's request for reconsideration was made out of time as it was sent (i) almost four and a half months after the First Resolution was entered, (ii) a little over four months after Salierno had received a copy of the First Resolution, and (iii) **83 days** after the September 3, 2020 deadline to appeal the First Resolution.

103.    In fact, realizing that his request was egregiously late and improper, Salierno attempted to couch the appeal as a "reconsideration."

104.    However, § 334-8 of the 2019 Ordinance unequivocally provides that only the "Board, on **its own motion**, may reconsider any of its prior determinations, or those of the Rent Regulation Officer, **upon a finding that there is new evidence not readily available at the time of the prior determination**."  (Emphasis added).  In short, a reconsideration of the First Resolution could only occur (i) upon the Board's own motion (and not upon a request by the Tenant Advocate well over

**nine months** after the Board made its decision on the record at the First Hearing and over **four months** after the First Resolution was entered), **and** (ii) upon the discovery of new evidence not available at the time of the hearing (and certainly not based upon a citation—not even evidence—to a section of the Ordinance that was obviously readily available and relied upon by everyone, including the Board and the Tenant Advocate, at the First Hearing).

105.    Salierno, as Tenant Advocate, thus knew that his reconsideration request was improper and not permitted under § 334-8 of the 2019 Ordinance.  So did Marotta.

106.    Via letter dated December 7, 2020, Plaintiff informed Marotta that it objected to Salierno's request for reconsideration and reminded Marotta that (i) it had owned the Property for only five months when the improper rent recalculation decrease the rent from $996.05 to $764.72 had been done, (ii) it had appealed that reduction and the Board had heard argument at the First hearing and improperly rejected Plaintiff's documentary evidence showing a vacancy in the unit in 1999 solely based on the testimony of Mercado, and (iii) it had chosen not to appeal that decision because the overcharges had been waived, to which Salierno did not object at the First Hearing and instead sat idly by and waited nine months to object to the same.

107.    In another shocking development, (i) despite the fact that the overcharges had been waived both at the First Hearing and in the First Resolution, (ii) despite the fact that Salierno was present at the First Hearing and received the First Resolution, he never objected at the time to the waiver, (iii) despite the fact that Salierno failed to file an appeal of the decision within 45 days of receipt of the First Resolution and, thus, was out of time to file an appeal under the New Jersey Court Rules, and (iv) despite the fact the Board could only reconsider its final decision on its own motion (which it did not do) and only if new evidence came to light (which none did), Marotta deliberately ignored Plaintiff's legally supported objections to a rehearing and directed the Board to schedule

another hearing (the "Second Hearing") on the exact same issues and evidence that were presented at the First Hearing and in connection with which Marotta and Salierno knew the Board had issued a final decision that could no longer be appealed or reconsidered.

108.     Completely ignoring the very terms of its own Ordinance, and in violation of Plaintiff's due process rights, the Board then scheduled the Second Hearing for February 8, 2021, which was later adjourned to March 8, 2021.

109.     Board members Colon, Guevara, Holguin, Vasquez, and Milan were present. Marotta, Ng, and Salierno were also present.

110.     At the Second Hearing, Salierno argued that Section 334-5(a)(3)(k) of the 2019 Ordinance provides that a landlord shall refund to a tenant and, if not, a tenant may take a credit against future rent for any overcharges.  Salierno further stated that the section further provides that any overcharge shall run with the property and that a successor owner shall be responsible for the refund.  Based on this language alone, Salierno argued that the Board did not have the power to waive the overcharge.

111.     In making this argument, Salierno knowingly and deliberately ignored and failed to mention that there was nothing in the ordinance that specifically prevented the Board from waiving overcharges under certain circumstances, such as those set forth by the Board at the First Hearing.

112.     More, Salierno also failed to mention that Marotta had expressly acknowledged at the First Hearing that the Board had broad powers and that it was not specifically prevented by the ordinance from waiving an overcharge under certain circumstances.

113.     Plaintiff responded first that the Second Hearing was essentially a complete rehearing of the First Hearing and of the First Appeal, and that any appeal of the Board's decision at the First Hearing and of the First Resolution should have been filed by no later than September 3, 2020

pursuant to the New Jersey Court Rules.  Since Salierno had made his request **83 days** after that deadline, under the New Jersey Court Rules, the Second Hearing was legally improper.

114.    Plaintiff also argued that Salierno's attempt to couch the request for a rehearing as one for reconsideration also failed because (i) only the Board itself could order the regarding on its own motion (which did not happen), and (ii) no new evidence that had not been available at the First Hearing was being presented.  As such, reconsideration was not legally permitted.

115.    Plaintiff finally explained that, despite the Board's Resolution waiving any overcharges, Plaintiff, in good faith and without any legal duty to do so, provided a credit to Puente of $2,203.83.

116.    In response to Plaintiff's argument that Salierno failed to file his appeal by September 3, 2021 (or 45 days from the day Plaintiff received the Board's Resolution), Salierno incredibly falsely represented to the Board on three separate occasions during the hearing that he had not received the Resolution in July or August:

I know I didn't receive [the Resolution] in July.

. . .

I remember waiting a long time to get to – to get the Resolution . . . I know I didn't receive it in – in July or August[.]

. . .

I – I know it wasn't in July or August.

117.    Upon hearing this unabashed and unwavering false declaration by Salierno that he had not received the Resolution in July or August in an attempt to argue that he had not filed his appeal out of time, Marotta sat quiet and did not say anything.

118.    Astoundingly, however, Salierno had, in fact, received the Resolution on July 20, 2020 – in complete contravention to his representations.  Worse yet, Marotta himself had sent Salierno

the Resolution on the date, via email.  The reason Plaintiff knows this is that Plaintiff's attorney was included on the same email.

119.    As such, both Salierno, via his representations to the Board, and Marotta, via his silence even though he knew Salierno was making material misrepresentations to the Board, deliberately and knowingly misled the Board into believing that Salierno had not filed his appeal within the time set forth under the New Jersey Court Rules.

120.    Then a further shocking moment came when Puente testified under oath that sometime in May 2020, after he was directed to pay his rent and that he was not being given a credit for the overcharge (since the Board had waived the overcharge), he went straight to the Union City Police Department at which time he was given purported legal advice by the police that the failure of Plaintiff to give him a credit for the overcharge (even though the Board had held it was waived) was somehow a fraud by Plaintiff.

> When I went home – before getting home I went to the Police Station in Union City and I put my record down notifying what happened.  The Police gave me something that said it was fraud [.]

121.    But that was not the end of it, Puente then stated that he then went to Mayor Stack's residence to discuss the overcharge issue.

> When I – when I – when I was going home, since Mr. Brian lives close to where New York [Avenue] is, I spoke to him.  I said, Mr. Brian, I have a problem.  I'm paying my rent seriously and now they're saying the month of rent that I paid, they're – they never got it.  I only have two people can help me.

122.    Not coincidentally, after Puente spoke with both the Police Department and Mayor Stack, Salierno sent his letter to Plaintiff demanding payment of the overcharges and then sent his letter to Marotta seeking a new hearing on the issue.  This made clear that Mayor Stack orchestrated and directed the events set forth herein, including the Second Hearing, by which Plaintiff was deprived of its due process rights.

123.    If that were not enough, both Salierno and Marotta blatantly attempted to lead Puente (during his testimony at the Second Hearing and during which he had an interpreter) to state that somehow, someway, Puente had not understood at the First Hearing that the overcharges had been waived, and that is why he did not appeal the decision on time.  However, Puente admitted that he could hear the interpreter during the hearing, who explained everything (thus necessarily that the overcharge would be waived).  Specifically, Puente admitted:

Yes.  [The interpreter] was explaining everything, the whole process.

124.    Then, after Marotta and Salierno realized that Puente would not actually say that he had not understood anything at the First Hearing, Marotta and Salierno both began to literally testify on Puente's behalf while Puente was still under oath and being examined.  First, Marotta stated:

Based on his testimony it appears that he believed it was still in effect.

Salierno then went even further and stated:

I think he testified that the Board was discussing different things but his under – what he understood the outcome to mean what – what's essentially reflected in the letter and what he had been told before that if the – if the calculation was affirmed, there would be an – there would be money due to him.

125.    Salierno did all of this at the Second Hearing despite the fact that Salierno, the Tenant Advocate charged with providing legal services to Puente at the First Hearing necessarily had informed Puente that the overcharges had been waived.  He also necessarily informed Puente of the First Resolution that expressly stated that the overcharges would be waived.  If Salierno had not, then he would have violated and/or breached his duties to Puente as legal advocate – surely that did not happen.

126.    Naturally, Plaintiff's attorney immediately objected to this testimony.  Unsurprisingly, and in conformance with the Board's decisions at the First Hearing, refusal to accept documentary

evidence provided by Plaintiff, and agreement to hold the Second Hearing, the objection fell on deaf ears.

127.     Plaintiff then argued that the provision relied upon by Salierno in attempt to impose liability on Plaintiff (an owner of only 5 months) for overcharges purportedly incurred prior to its purchase of the Property was not in effect at the time the property was purchased, and thus could not be applied to Plaintiff.  Indeed, that provision, i.e. § 334-5(a)(3)(k) (which provides that overcharges run with property and a successor owner shall be responsible for any refund) exists only in the 2019 Ordinance, which was adopted *after* Plaintiff purchased the Property.

128.     In fact, the applicable ordinance at the time was the 2017 Ordinance, which makes no mention of any overcharge running with a property or that a successive property owner shall be liable for said overcharges incurred prior to the purchase of the property.

129.     Plaintiff then argued that, even if the 2019 Ordinance were to apply the provision cited by Salierno is unconstitutional, as it imposes undue hardship and penalties on a successive owner in violation of due process.

130.     Finally, Plaintiff provided additional testimony and documentary evidence that, notwithstanding the foregoing, the base rent recalculation by Mercado was improper because it relied on a legal determination of base rent from 1987 and arbitrarily and capriciously ignored the factual documentation that showed that there existed a vacancy in Unit 1B (and thus a reset of the base rent) in 1999.  Plaintiff also demonstrated that, even if Mercado had used the correct base rent (which she did not), she nonetheless miscalculated the overcharge due.

131.     Even more, Plaintiff demonstrated via testimony and documentary evidence that, even if Mercado's arbitrary ignorance of the rent registration statements were somehow legitimate—and it was not—she nonetheless miscalculated the current rent she claims was to be paid by Puente because

she arbitrarily and for no valid reason failed to provide a permitted increase in that rent for the year 1998.

132.    After hearing argument and testimony, the Board unsurprisingly ruled against Plaintiff and in favor of Puente.  First, based on Salierno's false testimony and Marotta's silence regarding when Salierno received the First Resolution, the Board stated that it could not conclude that the appeal had been filed out of time – even though it had been filed months late.  Second, despite the express language of the 2019 Ordinance that states that a Board may reconsider a decision only upon the discovery of new evidence, it nonetheless concluded that it could also do so without new evidence, without citation to any ordinance provision or law.  Third, despite acknowledging that the 2017 Ordinance, which did not have a provision providing that any overcharge ran with a property and that a successive owner could be liable therefore, the Board arbitrarily and for no stated reason, applied the 2019 Ordinance, which was not in effect at the time Plaintiff purchased the Property.  As a result of all of these arbitrary and capricious decisions, the Board then completely reversed course from its decision at the First Hearing and in its First Resolution, and concluded that Plaintiff was now liable for overcharges that had been waived a year prior.

133.    Each of the Board members present agreed with that decision on the record.

134.    Via letter dated April 28, 2021, Plaintiff was served with a copy of the resolution (the "Second Resolution") memorializing the Board's decision at the February 10, 2020 hearing.

135.    Among other things, the Resolution stated the following reasons for its decision to impose the overcharge on Plaintiff :

- Salierno testified that he had not received the First Resolution in July 2020 – **when in fact he had.**

- Puente testified that he did not understand that the overcharges had been waived at the First Hearing and in the First Resolution – **even though he had an interpreter**

26

present at the First Hearing, and even though he was represented by Salierno at the time and Salierno necessarily informed him of the same.

- The Board did not have the authority to waive the overcharges under the 2019 Ordinance – **even though the Board acknowledged it had broad powers, that nothing in the 2019 Ordinance stated that it did not have the discretion to waive overcharges under certain circumstances, and that the applicable ordinance at the time, the 2017 Ordinance, did not contain any provision stating that an overcharge could run with the land and be imposed on a successive owner.**

136.    As a result of Defendants' coordinated egregious abuse of power, under color of law, Plaintiff has suffered extensive monetary and other damages in the form of, among other things, lost rents and the diminution of the value of its Property.

## COUNT ONE
## DEPRIVATION OF SUBSTANTIVE DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION
### (42 U.S.C. § 1983)

137.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if set forth at length herein.

138.    Plaintiff has the right to substantive due process, guaranteed under the Fourteenth Amendment of the United States Constitution, not to be deprived of their constitutionally protected property interests and liberties and to be free from the deliberate and arbitrary abuse of government power.

139.    Plaintiff has property interests and liberties in the ownership of its property, leasehold, and operation of its business.

140.    Defendants in this action acted under the color of state law.

141.    Defendants have arbitrarily and capriciously interfered with Plaintiff's constitutionally protected property interests and right to operate a business.

142.    Defendants acting under color of law, deliberately, unreasonably, arbitrarily and capriciously, among other things, (i) failed to provide information requested by Plaintiff in an

effort to comply with the City's ordinances, (ii) improperly calculated the rent for Plaintiff's tenant, (iii) improperly permitted an appeal that was not permitted pursuant to the New Jersey Court Rules, (iv) improperly permitted a rehearing on a final decision of the Board, (v) improperly considered unsubstantiated testimony from the Rent Leveling Board secretary, (vi) improperly relied on knowingly false testimony from the Tenant Advocate, and (vii) improperly relied upon an improper ordinance, (viii) improperly reversed course and imposed an overcharge on Plaintiff that had already been waived, (ix) improperly enforced a provision of its ordinance that arbitrarily and unfairly imposes an overcharge by a prior owner on a new owner; and (x) failed to provide any mechanism to object to Plaintiff's tenant's demand for a recalculation of his rent.

143.    The actions of Defendants as aforesaid lacked any legitimate reason and were arbitrary, capricious, not rationally related to any legitimate government interest, improperly motivated and conscience-shocking, in violation of the substantive due process guaranteed by the Fourteenth Amendment to the Constitution of the United States of America.

144.    The actions of Union City as aforesaid were taken out of ill will and designed to harm Plaintiff and to deny it the legal and proper use of its property.

145.    Defendants acted with knowledge that its actions against Plaintiff were unrelated to any legitimate government interest.

146.    Plaintiff has been deprived of the legal and proper use of its property, leasehold, and business and was otherwise injured as a result of Defendants' actions.

147.    As such, by the aforementioned conduct, Union City has denied Plaintiffs their rights, privileges and immunities secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

**COUNT TWO**
**DEPRIVATION OF PROCEDURAL DUE PROCESS UNDER THE**
**FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**
**(42 U.S.C. § 1983)**

148.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if set forth at length herein.

149.     Plaintiff has the right to procedural due process, guaranteed under the Fourteenth Amendment of the United States Constitution.

150.     Defendants have arbitrarily and capriciously interfered with Plaintiff's constitutionally protected right to procedural due process by depriving Plaintiff of its liberty and property interests without one of the fundamental elements of procedural due process, *i.e.* the opportunity to be heard.

151.     Defendants acting under color of law, deliberately, unreasonably, arbitrarily and capriciously, among other things, (i) failed to provide information requested by Plaintiff in an effort to comply with the City's ordinances, (ii) improperly calculated the rent for Plaintiff's tenant, (iii) improperly permitted an appeal that was not permitted pursuant to the New Jersey Court Rules, (iv) improperly permitted a rehearing on a final decision of the Board, (v) improperly considered unsubstantiated testimony from the Rent Leveling Board secretary, (vi) improperly relied on knowingly false testimony from the Tenant Advocate, and (vii) improperly relied upon an improper ordinance, (viii) improperly reversed course and imposed an overcharge on Plaintiff that had already been waived, (ix) improperly enforced a provision of its ordinance that arbitrarily and unfairly imposes an overcharge by a prior owner on a new owner; and (x) failed to provide any mechanism to object to Plaintiff's tenant's demand for a recalculation of his rent.

152.     By deliberately, unreasonably, arbitrarily and capriciously engaging in the aforementioned conduct, Defendants knew, or should have known, that they were violating

29

Plaintiff's established constitutional rights by denying Plaintiff one of the fundamental elements of procedural due process, and it was not objectively reasonable for Defendants to believe that its conduct did not violate Plaintiffs' established constitutional rights to procedural due process.

153.    The actions of Defendants as aforesaid were taken out of ill will and designed to harm Plaintiff and to deny it the legal and proper use of its property.

154.    Defendants acted with knowledge that its actions against Plaintiff were unrelated to any legitimate government interest.

155.    As such, by the aforementioned conduct, Defendants have denied Plaintiff its rights, privileges and immunities secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

**COUNT THREE**
**CONSPIRACY TO DEPRIVE DUE PROCESS UNDER THE**
**FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**
**(42 U.S.C. § 1983)**

156.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if set forth at length herein.

157.    Defendants agreed to, and in fact conspired to, engage in a collective campaign to deprive Plaintiff of its property and liberty interests, as guaranteed by the Fourteenth Amendment of the United States Constitution.

158.    As set forth above, Defendants' conduct was arbitrary and capricious and did not bear any substantial, rational or compelling relation to the administration and/or management of their relative governmental duties.

159.    Defendants, in concert with each other, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously, among other things, (i) failed to provide information requested by Plaintiff in an effort to comply with the City's ordinances, (ii) improperly calculated

the rent for Plaintiff's tenant, (iii) improperly permitted an appeal that was not permitted pursuant to the New Jersey Court Rules, (iv) improperly permitted a rehearing on a final decision of the Board, (v) improperly considered unsubstantiated testimony from the Rent Leveling Board secretary, (vi) improperly relied on knowingly false testimony from the Tenant Advocate, and (vii) improperly relied upon an improper ordinance, (viii) improperly reversed course and imposed an overcharge on Plaintiff that had already been waived, (ix) improperly enforced a provision of its ordinance that arbitrarily and unfairly imposes an overcharge by a prior owner on a new owner; and (x) failed to provide any mechanism to object to Plaintiff's tenant's demand for a recalculation of his rent.

160.     In doing all of these things, Defendants knew, or should have known, that they were violating Plaintiff's established constitutional rights, and it was not objectively reasonable for Defendants to believe that their conduct did not violate Plaintiff's established constitutional rights.

161.     Defendants' conduct set forth herein constitutes such egregious abuse of power that it shocks the conscience.

162.     As such, by the aforementioned conduct, Defendants, in concert with each other, denied and continue to deny Plaintiff its rights, privileges and immunities secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

163.     As a direct and proximate result of Defendants' unlawful conduct described above, Plaintiff has suffered and continues to suffer serious economic, property, mental and emotional, and other damages.   In addition, Defendants' actions as alleged above were committed intentionally and with malice, or with such recklessness as to be tantamount to intentional conduct, entitling Plaintiff to punitive damages.

**COUNT FOUR**
**FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUION**
**TAKINGS CLAUSE**
**(42 U.S.C. § 1983)**

164.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if set forth at length herein.

165.    The Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution provides ". . . nor shall private property be taken for public use, without just compensation."

166.    The actions of Union City as aforesaid fail to substantially advance any legitimate purpose and have the effect of depriving Plaintiff of the beneficial use of its property, in violation of Plaintiff's constitutional rights as secured by the Fifth and Fourteenth Amendments to the United States Constitution.

167.    As a result of Union City's actions as aforesaid, practical and feasible use of Plaintiff's Property and rights has been denied.

168.    The actions of Union City as aforesaid have the effect of regulating Plaintiff's Property, without compensation having been paid, in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

**COUNT FIVE**
**CLAIM IN LIEU OF PREROGATIVE WRIT**
**(Relief from Denial of Appeal)**

169.    Plaintiff repeats and re-alleges each of the foregoing allegations as if they were fully set forth at length herein.

170.    The Board's denial of Plaintiff's appeal was arbitrary, capricious, unreasonable, without legal or factual basis, and an abuse of discretion because, among other things, Defendants (i) failed to provide information requested by Plaintiff in an effort to comply with the City's

ordinances, (ii) improperly calculated the rent for Plaintiff's tenant, (iii) improperly permitted an appeal that was not permitted pursuant to the New Jersey Court Rules, (iv) improperly permitted a rehearing on a final decision of the Board, (v) improperly considered unsubstantiated testimony from the Rent Leveling Board secretary, (vi) improperly relied on knowingly false testimony from the Tenant Advocate, and (vii) improperly relied upon an improper ordinance, (viii) improperly reversed course and imposed an overcharge on Plaintiff that had already been waived, (ix) improperly enforced a provision of its ordinance that arbitrarily and unfairly imposes an overcharge by a prior owner on a new owner; and (x) failed to provide any mechanism to object to Plaintiff's tenant's demand for a recalculation of his rent.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendants:

a. declaring that Defendants violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution;

b. awarding injunctive relief prohibiting and enjoining Defendants from interfering with or unlawfully targeting Plaintiff's business and use of its Property;

c. finding that the Board acted in an arbitrary and capricious manner, and reversing the Board's decision relating to the rent calculation of the Rent Leveling Board and relating to the decision to impose upon Plaintiff the obligation to pay its tenant the overcharge.

d. declaring that the 2019 Ordinance and all amendments thereto, which purports to limit, diminish, alter or impair the constitutional protected rights of Plaintiff, unconstitutional;

e. awarding compensatory damages;

f. awarding exemplary and punitive damages;

g. awarding treble damages;

h. awarding attorneys' fees; and

i. awarding such other and further relief as the Court may deem just and proper either in law or in equity.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff requests a trial by jury on all issues so triable.

Dated: June 14, 2021    **KRANJAC TRIPODI & PARTNERS LLP**

    By: s/ Xavier M. Bailliard
      Xavier M. Bailliard
      James Van Splinter
      30 Wall Street, 12th Floor
      New York, NY 10005
      Tel: (646) 216-2400
      Fax: (646) 216-2373
      xbailliard@ktpllp.com
      jvansplinter@ktpllp.com

      *Attorneys for Plaintiff*

## **<u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>**

I hereby certify that, to the best of my knowledge, information and belief, the matter in controversy is otherwise not the subject of any action pending in any Court or of a pending arbitration proceeding and that no other action or arbitration proceeding is contemplated.


Dated: June 14, 2021                          <u>s/ Xavier M. Bailliard</u>
                                                     Xavier M. Bailliard