## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| OM 309-311 6TH STREET, LLC, OM 1101-1109 PALISADE AVENUE, LLC, THE STELLA ON PARK, LLC, GOLDEN CREST 3347 PARK AVENUE, LLC, OM 422-426 5TH STREET, LLC, OM-309-315 11TH STREET, LLC, AND OM 812 NEW YORK AVENUE, LLC, | |
| **Plaintiffs,** | |
| v. | Civ. No. 21-12051 (KM) (JRA) |
| THE CITY OF UNION CITY, UNION CITY RENT STABLIZATION BOARD AKA THE CITY OF UNION CITY RENT LEVELING BOARD, KENNEDY NG, NILDA MERCADO, YOELIS MARTE, ROSANNA COLON, NORMA GUEVARA, YAMIRYS HOLGUIN, SANDRA VASQUEZ, JUAN MILAN, ANANCY JAFARGIAN BOLIVAR CARDENAS, MICHAEL LOPEZ, HECTOR ROSARIO, MAYOR BRIAN P. STACK, JOHN V. SALIERNO, and NEIL D. MAROTTA, | **OPINION** |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiffs, landlord LLCs, allege that the actions of the City of Union City, the Union City Rent Stabilization Board (the "Board"), its members, the city's mayor, and other city officials constituted an uncompensated taking of property and violated their constitutional rights to substantive and procedural due process. Plaintiffs also bring actions in lieu of prerogative writs to challenge two specific decisions of the Board.

Defendants move to dismiss Counts 1–4 in their entirety and to dismiss several plaintiffs and defendants from the case. For the following reasons, defendants' motions (DE 30, 31, 32)[1] are **DENIED** in part and **GRANTED** in part.

## I.    BACKGROUND

Plaintiffs allege that their rights were violated on three separate occasions: First, when the Board arbitrarily reduced the rent of a tenant of OM 309-311 6th Street, LLC ("6th Street LLC") and ordered the LLC to pay back the rent that the tenant had allegedly been overcharged by the prior owner (Am. Compl. ¶ 42–148); Second, when the Board arbitrarily reduced the rent of a tenant of OM 1101-1109 Palisade Avenue LLC ("Palisade Avenue LLC") (*Id.* ¶¶ 149–216); and Third, when Union City Mayor Brian Stack allegedly retaliated against plaintiffs by sending letters to the tenants residing at properties owned by The Stella on Park, LLC, Golden Crest 3347 Park Avenue, LLC, OM 422-426 5th Street, LLC, OM-309-315 11th Street, LLC, and OM-812 New York Avenue, LLC, informing the tenants that plaintiffs had filed a fraudulent lawsuit and that the rent controlled tenants had a right to challenge their rents before the Board (*Id.* ¶ 217–225). There are numerous additional details, but these three events form the heart of the case.

Union City, New Jersey first adopted a rent control ordinance in 1973. (*Id.* ¶ 38.) That ordinance set a base rent, and calculated subsequent rent increases from that base rent. (*Id.*) The ordinance was amended many times over the years. In 1996, the city amended the ordinance to decontrol rents, and allow the base rent to be reset to the market-rate rent if any rent-controlled

---

[1]    Certain citations to the record are abbreviated as follows:

DE = docket entry in this case

Am Compl. = Amended Complaint (DE 17)

Mot. = City of Union City's Brief in Support of its Motion to Dismiss (DE 30-1)

Opp. = Plaintiffs' Omnibus Opposition to Motions to Dismiss (DE 37)

unit became vacant. (*Id.* ¶ 39–41.) The ordinance also required landlords to file "rent registrations" with the city, which allowed the city to monitor the rent paid by tenants and prevent illegal rent increases. (*Id.* ¶ 92.)

## A. 6th Street LLC

In 2018, plaintiff 6th Street LLC began negotiations to purchase properties in Union City, including Property #1. (*Id.* ¶ 47.) 6th Street LLC numerous times requested that the city provide it with the rent registration and other documents related to the properties so that it could determine the rents that the tenants would pay and assess the profitability of its investment. (*Id.* ¶ 48–56.) 6th Street LLC did not receive a full response from the city but nevertheless closed on Property #1 on May 7, 2019. (*Id.* ¶ 57.) Even after closing, 6th Street LLC still struggled to obtain the requested information from the city. (*Id.* ¶ 58–62.)

On August 30, 2019, defendant Nilda Mercado, the Secretary of the Board, informed 6th Street LLC for the first time that Emilio Puente, a tenant of Property #1, had complained that the rent he had been paying since moving into the unit in 2014, $996.05 per month, was an illegal overcharge.[2] (*Id.* ¶ 63.) The rent-controlled unit in which Mr. Puente lives changed hands in 1999 and was then rented by a new tenant for $487.33. (*Id.* ¶ 42–45.) Under the then-operative 1996 ordinance, $487.33 thus became the base rent from which any future increases should have been calculated. (*Id.* ¶ 46.) Mercado, however, calculated that Puente's 2019 rent should have been $764.72 per month, and that he had been overcharged $16,133.08 between 2014 and 2019. (*Id.* ¶ 63.) 6th Street LLC alleges that Mercado improperly calculated Puente's rent because she used a lower base rent from 1987, rather than the $487.33 base rent from 1999. (*Id.* ¶ 67.) What is more, for most of the period during which Puente was allegedly overcharged, the building was owned by the prior owner,

---

[2]     Apparently, a communication about Puente's complaint dated June 18, 2019 was meant for 6th Street LLC but was instead sent to the prior owner of the property. (*Id.* ¶ 69, 72.)

not by 6th Street LLC. Nevertheless, Mercado informed 6th Street LLC that it was required to pay the full $16,133.08 to Puente within ten days. (*Id.* ¶ 68.) 6th Street LLC disputed that decision with the city but received no substantive response until a letter dated December 12, 2019, confirmed that as of October 1, 2019, the legal rent for Puente's unit was $764.73.[3] (*Id.* ¶ 70–77.)

6th Street LLC then appealed that determination to the full Board, which held a hearing on February 10, 2020. (*Id.* ¶ 78–79.) Present at that meeting were Board members Rosanna Colon, Nancy Jafargian, Hector Rosario, Sandra Vasquez, and Juan Milan; Neil D. Marotta, the Board's attorney; John V. Salierno, the tenant advocate attorney; and Kennedy Ng, the city's rent leveling administrator. (*Id.* ¶ 80.) At the hearing, 6th Street LLC presented evidence that the apartment had changed hands in 1999, that therefore the appropriate base rent was the 1999 rent of $463.86, and that calculating from that base rent, Mr. Puente's legally permissible 2019 rent was $904.23, somewhat lower than what he had been paying but much higher than what Mercado had calculated. (*Id.* ¶ 81–84.) Tenant Advocate Salierno and Board attorney Marotta however, took the position that in order to prove the rent in 1999, 6th Street LLC needed to produce the 1999 lease, not merely the rent registration that had been filed with the city, although nothing in the ordinance required 6th Street LLC do so. (*Id.* 85–90.) Secretary Mercado, who had performed the rent calculation, testified that she had disregarded the 1999 rent registration which showed the unit had changed hands because some rent registrations contain mistakes. (*Id.* ¶ 91.) The Board therefore set aside the evidence presented by 6th Street LLC and concluded that Mercado had correctly calculated the rent. The Board decided, however, that it would waive the prior determination that 6th Street LLC owed Puente back the $16,133.08 in overpayments for the period 2014–19, because 6th Street LLC had only recently acquired the property. (*Id.* ¶ 94–

---

[3]     The Amended Complain contains no explanation for the one cent discrepancy between the calculated rent in the August 30 and December 12 letters. For current purposes, I ignore it.

99.) Five months later, on July 13, 2020, the Board issued its resolution endorsing Mercado's rent calculation and waiving the overcharge payment. (*Id.* ¶ 100–03.) A week later the resolution was sent to both Salierno and 6th Street LLC. (*Id.* ¶ 104.)

6th Street LLC, relieved not to owe the overcharge payment, decided not to appeal the decision of the Board. (*Id.* ¶ 108.) On September 30, 2020, Salierno informed 6th Street LLC that Puente elected to take the $16,113.08 overcharge – which the Board had waived – as a credit against future rent. (*Id.* ¶ 109.) 6th Street LLC reminded Salierno that the Board had waived the overcharges, but Puente stopped paying rent and on November 25, 2020, Salierno requested that the Board reconsider its decision and hold 6th Street LLC liable for the refund. (*Id.* ¶ 111–14.) Parties have 45 days to appeal the decision of the Board, and thus any appeals should have been filed by September 3, 2020. (*Id.* ¶ 107.) Technically Salierno did not appeal but rather requested that the Board reconsider its decision. The ordinance in effect at that time stated that the Board may reconsider decisions "on its own motion… upon a finding that there is new evidence not readily available at the time of the prior determination." (*Id.* ¶ 117.) Although it was Salierno, not the Board, who moved for reconsideration, and although there was no new evidence, the Board scheduled a second hearing, which took place on March 8, 2021. (*Id.* ¶ 121.)

At that second hearing, Board members Colon, Norma Guevara, Yamirys Holguin, Vasquez, and Milan were present, in addition to Marotta, Salierno and Ng. (*Id.* ¶ 122.) At the hearing, Salierno argued that the rent control ordinance specifically required that any overcharge shall run with the property and that a successor owner would therefore be responsible for refunding it. (*Id.* ¶ 123.) 6th Street LLC argued that nothing in the ordinance prevented the Board from using its discretion to waive fees, that the section of the ordinance stating that an overcharge shall run with the property was not in effect when the property

was purchased, and that the rehearing was procedurally improper.[4] (*Id.* ¶ 124–27, 140.) Puente also testified and informed the Board that he had met with Mayor Stack to discuss the overcharge. (*Id.* ¶ 134.) Although Puente himself testified that, through his interpreter, he had understood what happened at the first hearing, Salierno claimed that Puente did not understand. (*Id.* ¶ 137–38.) After this testimony, the Board reversed its previous decision and determined that 6th Street LLC was required to refund the full overcharge to Puente. (*Id.* ¶ 145.) A second resolution, memorializing the result of the second hearing, was sent on April 28, 2021. (*Id.* ¶ 147.)

**B. Palisade Avenue LLC**

Palisade Avenue LLC purchased a property, Property #2, in Union City on January 22, 2019. (*Id.* ¶ 149.) Palisade Avenue LLC made requests for information similar to those made by 6th Street LLC but also received no response from the city. (*Id.* ¶ 150.) One tenant in Property #2 at the time of purchase was Ramon Gracesqui, who had signed a lease with the previous owner that began on May 1, 2018, with a monthly rent of $1,650.00. (*Id.* ¶ 151.) On June 18, 2020, at the suggestion of city officials, Gracesqui filed a complaint about his rent with the Board. (*Id.* ¶ 155.) On August 11, 2020, Palisade Avenue LLC received a letter from the city, informing it that in response to Gracesqui's complaint, Yoelis Marte, the new Board Secretary, had calculated that Gracesqui's rent should have been $1,041.49 per month, effective October 1, 2019. (*Id.* ¶ 157–58.)

Attempting to formulate a response to this rent reduction, Palisade Avenue LLC again requested the records relevant to Property #2, and on August 25, 2020, received the rent control file for Gracesqui's unit. (*Id.* ¶ 161–62.) A letter from June 7, 2016 in the file revealed that as of 2015, the Board had calculated that the correct rent was $1,472.93, which, given the allowable annual increases, should have led to a 2020 rent of $1640.46 per month, ten

---

[4]    Salierno claimed that he had not received the resolution that was emailed to him on July 20, 2020. (*Id.* ¶ 129.)

dollars lower than the rent set in Gracesqui's lease, but six hundred dollars higher than the rent calculated by the Board. (*Id.* ¶ 164-65.) When recalculating the allowable rent at $1,041.49 per month, Board Secretary Marte had taken a 2011 rent calculation, rather than the 2015 calculation, as a base. (*Id.* ¶ 167.)

Palisade Avenue LLC appealed the recalculation of Gracesqui's rent, and a hearing was held before the Board on May 24, 2021. (*Id.* ¶ 170.) Palisade Avenue LLC argued that the rent control ordinances required the Board to rely on the most recent rent calculation (here, the 2015 calculation) when performing a recalculation. (*Id.* ¶ 172–73.) Salierno, however, argued that the 2015 calculation was potentially incorrect, and that the lower rent would better serve the rent stabilizing purposes of the ordinance. (*Id.* ¶ 176.) Marte testified that she had concededly disregarded the 2015 rent calculation because she believed it was not actually for Gracesqui's apartment but for a different apartment in the building. (*Id.* ¶ 186.) Marte also testified that she frequently disregarded rent registrations in favor of leases, and that she had spoken to Ng before determining that the 2015 rent calculation was a mistake. (*Id.* ¶ 197–99, 208.) The Board then denied Palisade Avenue LLC's appeal and, on July 8, 2021, served it with the resolution denying the appeal and stating that the 2015 rent calculation was not for Gracesqui's apartment but for a different unit. (*Id.* ¶ 213–15.)

## C. Letters to other plaintiffs

After this lawsuit was filed, plaintiffs allege, Mayor Stack sent a letter to "the majority of plaintiffs' tenants" which referred to this lawsuit as "fraudulent" and encouraged tenants to complain to the Board about the calculation of their rents. (*Id.* ¶ 218–21.) During the week of August 10, 2021, Mayor Stack allegedly used unnamed city employees to distribute that letter to the tenants of properties owned by plaintiffs The Stella on Park, LLC, Golden Crest 3347 Park Avenue, LLC, OM 422-426 5th Street, LLC, OM-309-315 11th Street, LLC, and OM-812 New York Avenue, LLC. (*Id.* ¶ 222.) It appears,

however, that the letter was not distributed to the tenants of 6th Street LLC or Palisade Avenue LLC.

### D. Claims and Procedural History

The Amended Complaint includes six Counts. The first four Counts are pleaded under 42 U.S.C. § 1983. Count 1 alleges deprivation of substantive due process by all defendants, who are alleged to have arbitrarily interfered with plaintiffs' constitutionally protected property rights under color of law. (*Id.* ¶ 226–36.) Count 2 alleges deprivation of procedural due process by all defendants, who are alleged to have deprived plaintiffs of their property interests under color of law without an opportunity to be heard. (*Id.* ¶ 237–44.) Count 3 alleges that all defendants conspired and engaged in a collective campaign to deprive plaintiffs of their property interests in violation of the Constitution. (*Id.* ¶ 245–52.) Count 4, brought against the City of Union City, alleges that the arbitrary rent recalculations took plaintiffs' property without compensation in violation of the Takings Clause of the Fifth Amendment. (*Id.* ¶ 253–57.) Finally, Counts 5 and 6 are actions in lieu of prerogative writs brought solely against the Board.[5] Count 5 seeks review of the denial of 6th Street LLC's appeal while Count 6 seeks review of the denial of Palisade Avenue LLC's appeal. (*Id.* ¶ 258–261.)

Plaintiffs first filed this lawsuit on June 14, 2021 and filed an Amended Complaint on August 21, 2021. (DE 1, 17.) Defendants filed their motions to dismiss on October 21 and 22, 2021. (DE 30, 31, 32.) Plaintiffs filed an omnibus brief in opposition to the motions (DE 37), and defendants filed three replies (DE 44, 45, 46.) The motions are fully briefed and ripe for decision.

## II.   LEGAL STANDARDS

### A. Standing

Under Rule 12(b)(1), a defendant may move to dismiss on the grounds that the court lacks subject matter jurisdiction over the dispute. Fed. R. Civ. P.

---

[5]   An action in lieu of prerogative writs is the means by which a plaintiff can have a court review the actions of a New Jersey municipality. N.J. Ct. R. 4:69-1.

12(b)(1). A Rule 12(b)(1) motion is the vehicle for a motion to dismiss for lack of standing. *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014). A Rule 12(b)(1) attack can be facial where the defendant "attacks the complaint on its face without contesting its alleged facts." *See Hartig Drug Co. v. Senju Pharms. Co.*, 836 F.3d 261, 268 (3d Cir. 2016). In such a case, the court considers only the allegations of the complaint and documents referred to therein, construed in the light most favorable to the plaintiff. *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

## B. Failure to State a Claim

Federal Rule of Civil Procedure 8(a) does not require that a pleading contain detailed factual allegations but "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must raise a claimant's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570. That standard is met when "factual content [] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim. The defendant bears the burden to show that no claim has been stated. *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016). I accept facts in the complaint as true and draw reasonable inferences in the plaintiffs' favor. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en banc).

## III.   DISCUSSION

### A. Standing

To properly allege standing, a plaintiff must allege that he or she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The alleged injury in fact "is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007). The

plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo*, 136 S. Ct. at 1547.

Here, only two of the seven plaintiffs have alleged that they suffered a concrete injury. The bulk of the complaint describes the experiences of 6th Street LLC and Palisade Avenue LLC before the Board. Those two plaintiffs clearly allege concrete injuries because, as to them, the Board allegedly ordered that a tenant pay less in rent than the landlord was entitled to. In addition, in 6th Street LLC's case, the Board ordered the landlord to pay the tenant approximately $16,000 in overcharges. (Am. Compl. ¶ 42–216.) The concrete monetary injuries suffered by 6th Street LLC and Palisade Avenue LLC are fairly traceable to the defendants and could be redressed, if appropriate, by a decision of this Court. 6th Street LLC and Palisade Avenue LLC have therefore properly alleged standing.

Allegations related to the other five plaintiffs are scant. All that is alleged is that the tenants of The Stella on Park, LLC, Golden Crest 3347 Park Avenue, LLC, OM 422-426 5th Street, LLC, OM-309-315 11th Street, LLC, and OM-812 New York Avenue, LLC received letters from Mayor Stack asserting that this lawsuit was fraudulent and that the tenants had a right to have the Board recalculate their rents.[6] (*Id.* ¶ 219–21.) The complaint alleges that in an attempt to retaliate against 6th Street LLC and Palisade Avenue LLC, the Mayor sent letters to the tenants of five other landlords, but not—for some reason—to the tenants of 6th Street LLC or Palisade Avenue LLC themselves. The Amended

---

[6]    The Amended Complaint is unclear about which tenants received the letters. It lists, by name, only five plaintiffs, The Stella on Park, LLC, Golden Crest 3347 Park Avenue, LLC, OM 422-426 5th Street, LLC, OM-309-315 11th Street, LLC, and OM-812 New York Avenue, LLC, but also states that tenants who lived in properties #3–#9 received the letters. Properties #3 and #4, however, are owned by Palisade Avenue LLC. (Am. Compl. ¶ 6.) I read inclusion of properties #3 and #4 as an error, and read the Amended Complaint as alleging that only the tenants of the five other plaintiffs received the letter. Regardless, whether or not Palisade Avenue LLC's tenants received the letter is unimportant at this stage because Palisade Avenue LLC has establishing standing based on the actions of the Board, even if the letters were never sent.

Complaint also states that the letters were "defamatory" (though it does not include a claim for defamation), but if anyone was defamed it was 6th Street LLC and Palisade Avenue LLC, not any of the other five plaintiffs. (*Id.* ¶ 218.) In short, all that is alleged is that those five landlords' tenants received letters from the city informing them of their legal rights under the rent control ordinance and allegedly "defaming" 6th Street LLC and Palisade Avenue LLC. There is no allegation that any of these tenants complained to the Board about their rent or that the city took any other action in relation to The Stella on Park, LLC, Golden Crest 3347 Park Avenue, LLC, OM 422-426 5th Street, LLC, OM-309-315 11th Street, LLC, or OM-812 New York Avenue, LLC. These plaintiffs, then, have suffered no concrete injury. The letters cost them no money, deprived them of no property, and did not violate any of their Constitutional rights. The implication that the letters may have encouraged tenants to bring complaints before the Board, and that as a result the landlords could have suffered a deprivation of rights, is purely hypothetical and conjectural. It cannot support standing. *See Winer Queen*, 503 F.3d at 325.

Because they have not alleged that they suffered an injury in fact, plaintiffs The Stella on Park, LLC, Golden Crest 3347 Park Avenue, LLC, OM 422-426 5th Street, LLC, OM-309-315 11th Street, LLC, and OM-812 New York Avenue, LLC must be dismissed from this case for lack of standing.

### B. Individual Defendants

Plaintiffs bring Counts 1, 2, and 3, against thirteen individual defendants.

- Brian Stack, Mayor of Union City. (Am. Compl. ¶ 19.)
- Kennedy Ng, Rent Leveling Administrator of the City of Union City. (*Id.* ¶ 20.)
- Nilda Mercado, Rent Leveling Board Secretary until 2020. (*Id.* ¶ 21.)
- Yoelis Marte, Rent Leveling Board Secretary after Mercado until August 2021. (*Id.* ¶ 22.)

11

- Juan Milan, Rent Leveling Board Chairman. (*Id.* ¶ 23.)
- Sandra Vasquez, Rent Leveling Board Vice Chairwoman. (*Id.* ¶ 24.)
- Rosanna Colon, Rent Leveling Board member. (*Id.* ¶ 25.)
- Nancy Jafargian, Rent Leveling Board member. (*Id.* ¶ 26.)
- Hector Rosario, Rent Leveling Board member. (*Id.* ¶ 27.)
- Norma Guevara, Rent Leveling Board member. (*Id.* ¶ 28.)
- Yamirys Holguin, Rent Leveling Board member. (*Id.* ¶ 29.)
- Neil D. Marotta, attorney for the Rent Leveling Board. (*Id.* ¶ 30.)
- John V. Salierno, Tenant Advocate Attorney for the City of Union City. (*Id.* ¶ 31.)

The Amended Complaint does not specify if the individual defendants are sued in their official or personal capacities, so I read the Amended Complaint to allege both. As discussed below, however, I dismiss Counts 1, 2, and 3 for failure to state a claim. Thus, no claims against the individual defendants remain. I nevertheless briefly discuss in the alternative certain clear-cut immunity issues related to the Board members, Marotta, and Salierno, that should be taken into account in any proposed amended complaint.[7]

### i. Board Members

"Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction." *Cleavinger v. Saxner*, 474 U.S. 193, 199 (1985). To determine if judicial immunity applies, a court must determine: (1) whether the judge's conduct was within his or her judicial capacity; and (2) whether the judge acted with general subject matter jurisdiction. *Mireles v. Waco*, 502 U.S. 9, 11–12 (1991). If both prongs are satisfied, absolute judicial immunity will not be disturbed. *See Figueroa v. Blackburn*, 208 F.3d 435, 445 (3d Cir. 2000).

Here, the Board members have argued not that they are judges but that they exercised a quasi-judicial power in adjudicating rent disputes, and are

---

[7]   I do not discuss the potential immunity of Mayor Stack, Ng, Marte, or Mercado.

therefore entitled to quasi-judicial absolute immunity. (Mot. at 24.) Such immunity "attaches when a public official's role is 'functionally comparable' to that of a judge. *Hamilton v. Leavy*, 322 F.3d 776, 785 (3d Cir. 2003) (quoting *Butz v. Economou*, 438 U.S. 478 (1978). New Jersey courts have had little difficulty in concluding that "[r]ent control boards, like adjustment and zoning boards, exercise quasi-judicial power." *Roth v. Rutherford Rent Bd.*, 239 N.J. Super. 378, 391 (Law Div. 1989); *see also JSM at Edison Terrace, LLC v. Edison Fair Rental Hous. Bd.*, No. A-4079-17T1, 2019 WL 1503972, at *2 (N.J. Super. Ct. App. Div. Apr. 5, 2019); *Doric Realty Co. v. Union City Rent Leveling Bd.*, 182 N.J. Super. 486, 493 (Law Div. 1981).[8]

Because the members of the Board exercise quasi-judicial power, all that is left is to determine if the conduct complained of in this lawsuit was taken within their quasi-judicial capacity and whether they acted with subject matter jurisdiction. The only facts pleaded in the Amended Complaint regarding these Board members involve their having attended adjudicatory meetings and voted in ways unfavorable to plaintiffs. (*E.g.*, Am. Compl. ¶ 80, 99, 122, 171.) The Amended Complaint contains no allegations the Board members in their individual capacities took bribes, conspired with one another or anyone else, or violated plaintiffs' rights in any way. Thus, I find that all actions taken by the Board members were within their quasi-judicial capacity in matters over which

---

[8]     Because precedent settles the point, I do not independently analyze the *Butz* factors as they relate to the Board. In general, however, the "touchstones" of quasi-judicial immunity are: "(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal." *Keystone Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011) (quoting Cleavinger, 474 U.S. at 202.). In addition, the Appellate Division of the New Jersey Superior Court has recently stated that "In determining whether an agency's decision is a quasi-judicial act, the key question is whether the fact finding involves a certain person or persons whose rights will be directly affected." *JSM at Edison Terrace*, 2019 WL 1503972, at *2 (quoting *Nw. Covenant Med. Ctr. v. Fishman*, 167 N.J. 123, 136 (2001)) (cleaned up).

they had subject matter jurisdiction. The Board members are therefore entitled to absolute quasi-judicial immunity.

### ii. Neil D. Marotta and John V. Salierno

Like judicial immunity, the litigation privilege has deep roots in the common law. *Loigman vs. Twp. Comm. of Twp. Of Middletown*, 889 A.2d 426, 433 (N.J. 2006). The privilege ensures that "[s]tatements by attorneys, parties and their representatives made in the course of judicial or quasi-judicial proceedings are absolutely privileged and immune from liability." *Peterson v. Ballard*, 679 A.2d 657, 659 (N.J. Super. Ct. App. Div. 1996) (citing *Erickson v. Marsh & McLennon Co., Inc.*, 569 A.2d 793 (N.J. 1990)). The privilege has four elements. It is applicable to any communication "(1) made in judicial or quasi-judicial proceedings; (2) by litigation or other participants authorized by law; (3) to achieve the objects of the litigation, and (4) that have some connection or logical relation to the action." *Hawkins v. Harris*, 661 A.2d 284, 289 (N.J. 1995). The litigation privilege is not limited to statements made in a courtroom during a trial; "it extends to all statements or communications in connection with the judicial proceeding." *Id.*

All of the facts pleaded with regard to Salierno and Marotta connected to the plaintiffs' constitutional claims fall squarely within the litigation privilege.[9] The Amended Complaint includes facts related to Marotta's communication with plaintiff before and during the appeals and his statements before the Board during the appeals. (Am. Compl. ¶ 88, 96, 119, 120, 137, 200, 201, 207.) All of Marotta's statements were made in or in relation to the quasi-judicial proceedings of the Board and are therefore protected by the litigation

---

[9]    Marotta also claims that he possesses quasi-judicial and legislative capacity immunity. (DE 31-1 at 15–26.) Both of those claims fall flat. Marotta was the attorney for the board. His position was not adjudicatory, and he therefore cannot claim to have quasi-judicial immunity. In addition, although it is unclear whether the Board and Marotta ever act in a legislative capacity, they did not do so in relation to the facts of this case. Marotta also claims that he is protected by qualified immunity (*id.* at 30–33), but I do not reach this issue because I find that the claims against him are covered by the litigation privilege.

privilege. The allegations related to Salierno are a bit more wide-ranging, but the vast majority relate to his statements and actions representing tenants before the Board. (*Id.* ¶ 85–86, 123–25, 129, 137–38, 176, 201) His other actions, such as requesting the reconsideration of Puente's appeal, are nevertheless connected to his representation and are covered by the litigation privilege. *Hawkins v. Harris*, 661 A.2d at 289.

Plaintiffs claim that the litigation privilege should not apply to Marotta and Salierno because they "were not acting in their *role* as attorneys but rather were *playing the role of attorneys* in connection with proceedings which were not fair adversarial proceedings but rather a kangaroo court generating pre-ordained results." (Opp. at 30 (emphasis in original).) Whatever the difference between "acting in their role" and "playing the role" may be, the fact remains that they acted as attorneys in a quasi-judicial proceeding and therefore their statements in connection with those proceedings are protected by the litigation privilege. Even if the proceedings were unfair, reached erroneous results, or violated plaintiffs' constitutional rights, that is not sufficient to override the litigation privilege and hold Marotta or Salierno liable in their individual capacities. I therefore find that Marotta and Salierno are immune from liability under the litigation privilege.

### C. Protected Property Interest

Before considering the allegations of deprivation of due process and uncompensated taking, I briefly discuss the preliminary issue of the property interests claimed by the remaining plaintiffs, 6th Street LLC and Palisade Avenue LLC. Both plaintiffs purchased properties that are governed by the rent control ordinance; they admit, as they must, a preexisting limit on the use and enjoyment of their property, in that they cannot claim an unfettered right to lease apartments at a market rate. What they do possess, however, is a right to contract with tenants to charge the maximum legal rent, as determined by the rent control ordinance. *Lynch v. United States*, 292 U.S. 571, 579 (1934) ("Valid contracts are property, whether the obligor be a private individual, a

municipality, a State or the United States.") Generally, such "[l]ease rights are recognized property rights that are subject to the Takings Clause." *Cebe Farms, Inc. v. United States*, 116 Fed. Cl. 179, 191 (2014).[10] A wrongful reduction of the rent that the landlords can charge, in violation of the provisions of the rent control ordinance, could thus represent a deprivation of a recognized property interest. Similarly, the uncompensated taking of such a property interest could violate the Fifth Amendment. Defendants concede as much; they acknowledge that plaintiffs have a property interest in collecting the legal rent for occupied units, but claim they were not deprived of that right and that the property interest was not taken by the city. (Mot. at 31, 46.)

### D. Substantive Due Process

Plaintiffs 6th Street LLC and Palisade Avenue LLC allege in Count 1 that the decisions of the Board violated their right to substantive due process under the Fourteenth Amendment. "Substantive due process is a component of the [Fourteenth Amendment] that protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Newark Cab. Ass'n v. City of Newark*, 901 F.3d 146, 155 (3d Cir. 2018) (alteration in original) (cleaned up). The Third Circuit has "recognized that two very different threads make up the fabric of substantive due process: substantive due process relating to legislative action and substantive due process relating to non-legislative action." *Id.* (cleaned up). Plaintiffs here attempt to state a non-legislative substantive due process claim. To state such a claim, a plaintiff must allege he has "a property interest protected by the substantive due process clause, and the government's deprivation of that protected interest shocks the conscience." *Joey's Auto Repair & Body Shop v. Fayette Cnty.*, 785 F. App'x 46, 49 (3d Cir. 2019) (cleaned up).

---

[10]     For a lengthy discussion of the relationship between contract and property rights in the context of landlord/tenant law see Thomas W. Merrill & Henry E. Smith, *The Property/Contract Interface*, 101 COLUM. L. REV. 773, 820–33 (2001).

I find that although plaintiffs have alleged that they have a property interest protected by the substantive due process clause, they have not alleged a deprivation of that interest that shocks the conscience.

Defendants, in their brief in opposition, argue that plaintiffs' property interests lack that "certain quality" that makes them worthy of protection under the substantive due process clause. (Mot. at 31.) This, whatever it may mean, is incorrect. In fact, the case upon which defendants rely to make this argument, *Nichols v. Pennsylvania State University*, emphasized that the one area to which substantive due process clearly applied was the area of land ownership. 227 F.3d 133, 141 (3d Cir. 2000) ("one would be hard-pressed to find a property interest more worthy of substantive due process protection than [land] ownership" (quoting *DeBlasio v. Zoning Bd. of Adjustment for Twp. of W. Amwell*, 53 F.3d 592, 601 (3d Cir. 1995), *abrogated on other grounds by United Artists Theatre Cir., Inc. v. Twp. of Warrington, PA*, 316 F.3d 392 (3d Cir. 2003))); *see also Trotta v. Borough of Bogota*, No. 12-CV-2654 (KM)(MAH), 2016 WL 3265689, at *6 (D.N.J. June 6, 2016). The property right here was directly related to the plaintiffs' ownership of apartment buildings in Union City. That is a right protected by the substantive due process clause against a deprivation that shocks the conscience.

Plaintiffs, however, fail to plausibly allege that the deprivation of their property right in charging tenants the legal rent shocks the conscience. The Supreme Court has set a high bar for such claims and, as the Supreme Court of New Jersey has noted, "the collective conscience of the United States Supreme Court is not easily shocked." *Rivkin v. Dover Twp. Rent Leveling Bd.*, 143 N.J. 352, 366 (1996); *see also Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998). A government action that is merely "arbitrary" or made with "improper motive" does not, necessarily implicate the substantive due process clause; rather, the "shocks the conscience" standard encompasses only "the most

17

egregious official conduct."[11] *United Artists Theatre*, 316 F.3d at 400–02 ("Land-use decisions are matters of local concern, and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with 'improper' motives.").

Courts have generally been hesitant to find conscience-shocking behavior in the land use context.[12] The Third Circuit has provided examples of wrongdoing in the land-use context that might rise to the level of shocking the conscience. These include wrongdoing that was "permeated" with corruption, self-dealing, and bias against an ethnic group. *Giuliani v. Springfield Twp.*, 238 F. Supp. 3d 670, 696–97 (E.D. Pa. 2017), *aff'd*, 726 F. App'x 118 (3d Cir. 2018); *see also Chainey v. Street*, 523 F.3d 200, 220 (3d Cir. 2008). Here, plaintiffs do not allege that there was ethnic or racial bias or self-dealing, but they imply that the mayor and Board are "corrupt" in some general sense of their decisions being politically biased in favor of tenants. Although the opening line of their opposition brief claims "This is a case about government corruption" (Opp. at 1), plaintiffs do not allege corruption plausibly, specifically, or factually. The brief provides two pages worth of allegations that plaintiffs allege demonstrate a "concerted, premeditated, coordinated, and calculated effort by multiple municipal officials to use improper and illegal means to deny Plaintiffs of their constitutionally-protected rights." (*Id.* at 15–

---

[11]    Government actions that have been found to shock the conscience include forced stomach pumping, *Rochin v. California*, 342 U.S. 165 (1952); destroying a business by creating a fake tax liability, *Conroe Creosoting Co. v. Montgomery Cnty.*, 249 F.3d 337 (5th Cir. 2001); selective enforcement of zoning ordinances solely to prevent citizens from exercising their right to obtain an abortion, *Associates in Obstetrics & Gynecology v. Upper Merion Township*, 270 F.Supp.2d 633 (E.D.Pa.2003); and an illegal scheme to force plaintiff to provide low-cost housing to a specific individual, *Singh v. Twp. of Weehawken*, 2019 WL 13098594 at *1-2 (D.N.J. Aug. 21, 2019).

[12]    Cases in the Third Circuit that have found that government actions in the land use context did not shock the conscience include *Tucker Indus. Liquid Coatings, Inc. v. Borough of E. Berlin*, 656 F. App'x 1, 5 (3d Cir. 2016); *Locust Valley Golf Club, Inc. v. Upper Saucon Twp.*, 391 F. App'x 195, 199 (3d Cir. 2010); *Skiles v. City of Reading*, 449 Fed. App'x. 153, 158 (3d Cir. 2011); *Highway Materials, Inc. v. Whitemarsh Twp.*, 386 Fed. App'x. 251, 258 (3d Cir. 2010).

17.) The actions outlined in that section are summarized above, but despite plaintiffs' claims, there is no indication that money was exchanged for political favors, or that any corrupt bargain caused the Board's actions.

The centerpiece of plaintiffs' corruption allegation in the Amended Complaint is the meeting between Puente (the rent-controlled tenant of 6th Street LLC) and Mayor Stack at Stack's residence. (Am. Compl. ¶ 134; Opp. at 32.) The implication, it appears, is that Puente somehow influenced Mayor Stack in his own home and Stack then ordered the Board to reconsider Puente's case. The Amended Complaint, however, does not specifically allege how Puente influenced Stack in any manner beyond that of persuasion. Nor does it directly allege that Mayor Stack exerted influence on the Board. Rather the Amended Complaint states that Puente and Stack spoke, and then, "not coincidentally," Salierno sent the letter to 6th Street LLC demanding payment. "This," the complaint alleges, "made clear that Mayor Stack orchestrated and directed the events set forth herein, including the Second Hearing, by which Plaintiff OM 309-311 6th Street was deprived of its due process rights." (Am. Compl. ¶ 134.) These allegations seem at most to suggest arbitrariness, not conscience-shocking corruption. Even if Mayor Stack did act as a go-between to the Board (which is not specifically alleged), it appears from the Amended Complaint that he did so at the request of a constituent. A scenario in which city government takes the side of a $900-per-month tenant against a substantial property owner and landlord does not exactly cry out "corruption"; more facts are needed.

The allegations of corruption relating to Palisade Avenue LLC's experience before the Board are even less clear. Those allegations center on the fact that Board Secretary Marte admitted that she conferred with Kennedy Ng, the Rent Leveling Administrator for the city, in the process of calculating the legal rent for Gracesqui's unit. (Am. Compl. ¶ 208.) The Amended Complaint alleges that Marte's testimony made clear that Ng instructed Marte to ignore the 2015 rent calculation and instead lower Gracesqui's rent based on the 2011 base figure. (*Id.* ¶ 209.) While this process may be criticized, it is not

19

"corrupt" in the ordinary sense for a Rent Board member to communicate with the Rent Leveling Administrator; nor is there any indication of a corrupt motive (or of mayoral involvement). The Amended Complaint contains no allegation that Gracesqui improperly met with or exercised influence over Mayor Stack, Administrator Ng, or any other city official.

In short, the plaintiffs' intimations that corruption, rather than incompetence, arbitrariness, or a general political bias in favor of tenants, fall flat. Without specific and plausible allegations of corruption, plaintiffs cannot demonstrate that defendants' actions "shock the conscience," and thus cannot state a claim for deprivation of substantive due process. I will therefore dismiss Count 1.

### E. Procedural Due Process

In Count 2, plaintiffs allege that the "kangaroo court" proceedings of the Board deprived them of their right to procedural due process. (Opp. at 1.) "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of" the Fourteenth Amendment's Due Process Clause. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

Procedural due process claims are subject to a two-stage analysis: (1) are "the asserted individual interests . . . encompassed within the fourteenth amendment's protection of 'life, liberty, or property?'" and (2) do the procedures available provide a plaintiff whose interests are deprived "due process of law?" *Robb v. City of Philadelphia*, 733 F.2d 286, 292 (3d Cir. 1984). As for the first stage, as discussed *supra,* Sec. III.C., I have found that plaintiffs properly allege that they were deprived of a constitutionally relevant property interest: their interest in receiving the legal rent that they contracted for with their tenants. Thus, the inquiry must focus on whether the procedures available to plaintiffs were sufficient.

Remedial procedures are constitutionally inadequate if they "contain a defect so serious [as to] characterize the procedures as fundamentally unfair." *Giuliani v. Springfield Twp.*, 238 F. Supp. 3d, 670, 690 (E.D. Pa. 2017). It is not

just the proceedings before the Board that must be analyzed, however. "[A] state provides constitutionally adequate procedural due process when it provides reasonable remedies to rectify a legal error by a local administrative body." *Giuliani v. Springfield Twp.*, 726 Fed. App'x. at 122. Thus, "when a state affords a full judicial mechanism with which to challenge the administrative decision in question, it provides adequate procedural due process, whether or not the plaintiff avails himself or herself of the provided appeal mechanism." *Id.* (cleaned up); *see also Custin v. Wirths*, 2020 WL 1466352 at *20 (D.N.J. Mar. 25, 2020); *DeBlasio*, 53 F.3d at 597, *abrogated on other grounds by United Artists Theatre*, 316 F.3d 392.

Many procedural due process cases, including *Matthews v. Eldridge,* focus on whether a pre-deprivation remedy is required or whether post-deprivation processes are sufficient. Here, plaintiffs explicitly state that they do not intend to challenge Union City's rent control ordinance, which contains no pre-deprivation remedies. (Opp. at 12 n.5, 25 n.13.) I thus interpret their position not as arguing that a pre-deprivation remedy is necessary but that the post-deprivation remedies provided by the Board are insufficient.[13] Plaintiffs allege numerous unlawful actions by the Board, and the Amended Complaint describes the Board's blatant unwillingness or inability to follow the relevant laws. There is one key problem with plaintiffs' procedural due process claim: they have not yet finished pursuing the state-provided remedies that can correct the errors of the Board. In fact, they are pursuing those remedies in this very case, in Counts 5 and 6 (action in lieu of prerogative writs). It is thus

---

[13]    Defendants describe the appeals before the Board as "pre-deprivation" proceeding but it seems that characterization was incorrect. The action that caused plaintiffs to appeal to the Board was the prior receipt of the letter informing them that the tenants' rents had been lowered. (Mot. at 37.) I thus view both the Board appeals and the action in lieu of prerogative writs as post-deprivation remedies. Although plaintiffs briefly allude to the idea that it would be practical for the Board to provide a pre-deprivation process (Opp. at 32), they do not pursue their argument and claim that they do not seek to challenge the rent control ordinance. I thus understand the plaintiffs' position as a challenge to the adequacy of the post-deprivation procedures.

impossible to conclude, at this point, that there has been a deprivation of procedural due process.

I first outline the post-deprivation process that Union City and the state of New Jersey have provided to landlords. When the Board adjusts a tenant's rent, both the tenant and landlord have the right to appeal to challenge the new rent calculation. (Am. Compl. ¶ 78.) On appeal, the Board sits as a quasi-judicial body, and, as described in the Amended Complaint, the appellant is able to present both documentary and testimonial evidence to the Board as well as cross examine witnesses. (*Id.* ¶ 42–216.) After the hearing, the Board issues a "resolution," *i.e.*, a decision, resolving the appeal. (*Id.* ¶ 101, 147) The Board can, on its own motion, reconsider a resolution if new evidence comes to light. (*Id.* ¶ 117.) In theory, at least, this process seems to comport with due process, but plaintiffs argue that in practice the Board is a lawless entity which discounts probative evidence and reaches preordained conclusions, thus depriving plaintiffs of due process. Board reconsideration, however, is not the end of the road. The New Jersey Constitution and New Jersey court rules allow parties dissatisfied with the decisions of a municipal board to bring an "action in lieu of prerogative writs" in New Jersey Superior Court to review the decision of the municipal board.[14] The action in lieu of prerogative writs is not an appeal as such. Rather it is part and parcel of the post-deprivation remedy provided by the state. *Rivkin*, 143 N.J. at 378 ("The post-deprivation remedy that the State furnished to the Rivkins was an action in lieu of prerogative writs.") In short, defendants are correct to argue that plaintiffs must complete the action in lieu of prerogative writs before claiming that they were deprived of due process. (Mot. at 37.)

Here, plaintiffs decided to partially forgo the usual procedure of filing asn action in lieu of prerogative writs in state court. Instead, they filed this case in federal court alleging Constitutional violations by defendants and *also*

---

[14]     Actions in lieu of prerogative writs can also be brought in federal court as discussed at Sec. III.H, *infra.*

including two Counts of action in lieu of prerogative writs that ask this court to review the decisions of the Board in 6th Street LLC and Palisade Avenue LLC's cases. Because I have not yet ruled on the actions in lieu of prerogative writs, the plaintiffs are effectively still in the midst of the processes provided by the state. A decision by this court in plaintiffs' favor could rectify whatever procedural deficiencies occurred at the Board. If I rule in their favor on the actions in lieu of prerogative writs (or if they had filed an action in Superior Court and the Superior Court ruled in their favor), then—from the plaintiffs' perspective—the system worked: the procedures put in place by the state remedied an incorrect decision by a municipal Board and thus the plaintiffs received due process.

It is important to note that the invocation of error-correction procedures provided by the state does *not* imply an exhaustion requirement. Rather, it is inherent to the concept of procedural due process. One cannot properly allege that the procedures the state provides were defective and fundamentally unfair if those procedures have not yet been tried. Because their actions in lieu of prerogative writs are still before this court (and will not be dismissed, *see infra*), plaintiffs are receiving and will receive due process. [15]

Other similar cases in which plaintiffs stated a claim for deprivation of procedural due process are easily distinguished. In *Johnson v. Paterson Hous. Auth.*, the court held that the plaintiff was not required to file an action in lieu of prerogative writs in order to state a claim for deprivation of procedural due process. No. CV177514ESMAH, 2019 WL 1439118, at *4 (D.N.J. Apr. 1, 2019).

---

[15]     In this way, the due process analysis is different from the exhaustion requirement for takings claims that the Supreme Court eliminated in *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162 (2019), as discussed *infra*, Sec. III.G. And there is no general exhaustion prerequisite to bringing a section 1983 action in federal court. *See Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 500–01, 516 (1982). Plaintiffs have not, by the way, articulated any reason why they would not receive due process if they brought actions in lieu of prerogative writs in New Jersey Superior Court. But as this court possesses jurisdiction, they have the option to pursue such actions here.

That case, however, was about a tenant who was evicted and not given the required pre-deprivation hearing, despite her requests for one. *Id.* at *1. Because the state had failed to provide the required pre-deprivation process, the violation was complete; the plaintiff did not also need to challenge the post-deprivation remedy or file an action in lieu of prerogative writs. Here, plaintiffs do not challenge the lack of a pre-deprivation remedy by the Board, but rather the adequacy of post-deprivation remedies; in effect they challenge the adequacy of a procedure that is still ongoing.

Similarly in *Romspen Robbinsville, LLC v. Twp. of Robbinsville*, the plaintiff was able to state a claim for deprivation of procedural due process without respect to the availability of an action in lieu of prerogative writs because the township refused to consider its development application and therefore never provided a final decision that could be reviewed by the Superior Court. No. CV203248MASZNQ, 2021 WL 794786, at *6 (D.N.J. Mar. 1, 2021). Here, in contrast, the Board issued resolutions in the cases of both 6th Street LLC and Palisade Avenue LLC that are currently being challenged by plaintiffs in Counts 5 and 6.

Perhaps the Board's decision was erroneous; perhaps not. But because the plaintiffs are still pursuing the procedures put in place by the state to remedy an erroneous decision of the Board, they have not been deprived of procedural due process. I will therefore dismiss Count 2, without prejudice, in order to give the actions in lieu of prerogative writs priority.

### F. Conspiracy

In Count 3, plaintiffs allege that the defendants conspired to violate their constitutional rights under 42 U.S.C. § 1983. To prevail on a conspiracy claim under § 1983, a plaintiff must prove that two or more persons acting under color of state law "reached an understanding" and took "concerted action" to deprive him of his constitutional rights. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150–52 (1970); *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 295 (3d Cir. 2018). Such rights include those protected by the Due Process Clause of the Fourteenth Amendment, such as, relevant here, the "right to be heard in an

impartial forum," *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 161 (3d Cir. 2010), and the "right of access to the courts," *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008).

Here, plaintiffs fail to plausibly allege a conspiracy because they plead no facts that suggest the defendants reached an understanding or agreement to deprive plaintiffs of their constitutional rights. Instead, all suggestions of conspiracy between any of the defendants is purely speculative. As discussed *supra*, Sec. III.D., there is only one concrete allegation of any of the defendants meeting with one another and potentially agreeing to anything: Marte admitted that she had spoken to Ng regarding Gracesqui's rent calculation. (Am. Compl. ¶ 208.) It is plausible that Ng told Marte to ignore the 2015 rent calculation and thus provide Gracesqui with a lower rent, and it is plausible that such an instruction would be incorrect under the rent control ordinance. Plaintiffs do not plead any facts, however, suggesting that Ng and Marte reached an agreement to violate their constitutional right to be heard in an impartial forum.

Similarly, the Amended Complaint's discussion of the meeting between Puente (who is not a defendant) and Mayor Stack does not include any facts indicative of a conspiracy. Puente gave testimony that in May 2020 he asked Mayor Stack for assistance (*id.* ¶ 134), but there is no concrete accusation in the complaint that Mayor Stack took any action at all on Puente's behalf. Plaintiffs try to paper over their lack of specificity by claiming that "not coincidentally" Salierno sent his letter stating that Puente would take his overcharge as a credit toward future rent "after" Puente spoke to the mayor. (*Id.* ¶ 109, 135.) The Amended Complaint, however, obfuscates the fact that Salierno's September 30 letter was sent to 6th Street LLC approximately four months after the May 2020 meeting between Puente and Mayor Stack. Salierno then requested reconsideration of the decision two months later on November 25, 2020. (*Id.* ¶ 114.) Plaintiffs' theory of the conspiracy is not quite clear, but it is implied that Mayor Stack, after meeting with Puente, set out to convince or

cajole other members of city government to violate plaintiffs' constitutional rights. Aside from the fact that this story lacks any clear motive on behalf of the defendants that would lend it plausibility, the months-long gap between Mayor Stack's meeting with Puente and Salierno's subsequent letters renders the claims of conspiracy implausible.

To make up for the Amended Complaint's lack of specifics, plaintiffs attempt to lump all of the bad behavior of various officials, including even the lack of response to plaintiffs' open records requests, into an overarching conspiracy. (Am. Compl. ¶ 248.) Such conclusory statements of conspiracy, however, are not sufficient to state a claim. Although at this stage I make all possible inferences in favor of plaintiffs, I must make those inferences only from the pleaded facts. *Iqbal*, 556 U.S. at 678. Here, facts tending to demonstrate an agreement between the defendants to deprive plaintiffs of their constitutional rights are lacking. I must therefore dismiss Count 3.

### G. Taking

In Count 4, plaintiffs allege that the actions of the Board constitute a taking of 6th Street LLC and Palisade Avenue LLC's property by the City of Union City without compensation in violation of the Fifth Amendment.[16] As a preliminary matter, the Supreme Court has held that there are no longer state court exhaustion requirements for plaintiffs who wish to pursue a taking claim in federal court. Rather, "because a taking without compensation violates the self-executing Fifth Amendment at the time of the taking, the property owner can bring a federal suit at that time." *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2172 (2019). Thus, assuming that the Board illegally lowered the rents of Puente and Gracesqui, the taking was accomplished at that time. Plaintiffs could then sue in federal court and attempt to state a claim. I find that although it is a close question, plaintiffs have plausibly alleged an uncompensated taking.

---

[16]    It is somewhat unclear whether the city or the Board is the proper defendant in the takings claim, but both remain as defendants in the case.

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.[17] Under that provision, I am tasked with a two-step process: First, I must determine if the plaintiffs have asserted a "legally cognizable property interest." *Park Restoration, LLC v. Erie Ins. Exch.*, 855 F.3d 519, 526 (3d Cir. 2017) (quoting *Prometheus Radio Project v. FCC*, 373 F.3d 372, 428–29 (3d Cir. 2004)). That requirement, based on property ownership, is uncontroversial. Second, I evaluate the plaintiff's claim that their property was taken from them, asking: "(1) was there a taking?; (2) was that taking for public use?; (3) did the claimant receive just compensation?" *Id.* at 525. Though "[t]he paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property," government regulation "may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster," and "such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005).

No physical invasion has taken place here; the claim is clearly one of a regulatory taking. For a regulatory taking, there are two distinct tests. The first is the so-called "per se" taking identified in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992), pursuant to which "a regulation which 'denies *all* economically beneficial or productive use of land' will require compensation under the Takings Clause" unless the challenged limitations "inhere . . . in the restrictions that background principles of the State's law of property and nuisance already placed upon land ownership." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1937 (2017) (emphasis added); *see also Lucas*, 505 U.S. at 1015, 1029. This is a difficult test to satisfy: the court must find that the regulation forces the plaintiffs to "leave [their] property economically idle."

---

[17]   The Takings Clause applies to state and local governments through the Fourteenth Amendment. *Chicago, B & Q R., Co. v. City of Chicago*, 166 U.S. 226, 241 (1897).

505 U.S. at 1019. Here, plaintiffs do not, and cannot, allege that their properties have been rendered economically idle because all tenants, including Puente and Gracesqui, will continue to pay rent and thus generate revenue for the plaintiffs.

### i.  *Penn Central* Factors

Rather, plaintiffs allege a regulatory taking under the more fluid evaluation known as the *Penn Central* test, which evaluates the alleged taking based on "a complex of factors," including "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 137 S. Ct. at 1937 (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)); *see Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978).

The function of the *Penn Central* test is to "identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain. Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes upon private property rights . . . . the *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539–40 (2005).

The government's regulatory authority is broad, and the availability of relief under *Penn Central* is correspondingly narrow. "[A] regulatory limitation on the right to use and receive profits from property will not necessarily or even usually establish that there has been a taking." *Pinewood Estates of Michigan v. Barnegat Township Leveling Bd.*, 898 F.2d 347, 351 (3d Cir. 1990) (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434–35 (1982)).

"[T]he submission that appellants may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest

that they heretofore had believed was available for development is quite simply untenable." *Penn Central*, 438 U.S. at 130. Thus, courts tend to reject takings claims where a law imposes restrictions "substantially related to the promotion of the general welfare" and which, while ruling out some uses, nevertheless "permit reasonable beneficial use." *Rogin v. Bensalem Township*, 616 F.2d 680, 691 (3d Cir. 1980). In particular, states are afforded "broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Yee v. City of Escondido*, 503 U.S. 519, 528–29 (1992). I take the three *Penn Central* factors in order.

### 1. Economic impact

There is no single test to determine the degree of economic impact that will cross the line to a "taking." Courts have generally held that the diminution of value of the claimant's property must usually be "drastic," *Rogin*, 616 F.2d at 692, and that it must deny the claimant the opportunity to make a "reasonable return" on its investment, *see Penn Central*, 438 U.S. at 136. Still, the economic impact of the government action must be balanced against the action's effect on the claimant's investment-backed expectations and the character of the government action. *See infra.*

Plaintiffs do not quantify the overall impact of the Board's actions on the value of their properties, but assert in their opposition brief that the Board's "illegal actions resulted in a distinct diminution of the value of the properties at issue." (Opp. at 23.) The economic impact of the Board's actions on the properties as a whole may be characterized as fractional. Puente, the tenant of 6th Street LLC, occupies one unit of a 41-unit apartment building. (Am. Compl. ¶ 4.) Gracesqui, the tenant of Palisade Avenue LLC, occupies one unit of a 14-unit apartment building. (DE 30-2, Ex. C.) In each case, the relevant property is the "parcel as a whole" which in this case would yield the legal rental payments made by all of the tenants in the buildings, not just Puente or Gracesqui's rental payments alone. *See Dist. Intown Properties Ltd. P'ship v. D.C.*, 198 F.3d 874, 880 (D.C. Cir. 1999) (holding that the relevant property

was the parcel as a whole, even though it had been subdivided into nine lots); *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 327 (2002). Thus, even if the revenue generated by each unit was reduced to nothing, which it was not, the amount of revenue that each property could generate for its owner would be reduced, at the very most, by less than ten percent.[18]

Plaintiffs fear a situation in which the tenants act collectively and ask the Board to recalculate the rent for every apartment in the building and the Board, arbitrarily and lawlessly slashes rents for all tenants. That possibility, which would lead to a much greater reduction in the value of the property, is speculative at this point. Nevertheless, there is force to the argument that plaintiffs have a property interest in their entitlement to charge the maximum allowable rent under leases entered into with tenants. The city cannot necessarily avoid a taking by arbitrarily cutting rents in a piecemeal fashion, so that no single diminution of value is "drastic." Thus, even if the diminution of value of the properties as a whole was relatively small, it weighs somewhat, if not strongly, in favor of finding that a taking has been alleged and must still be weighed alongside the other two *Penn Central* factors.

### 2. Investment-backed expectations.

Next, I consider the factor of plaintiffs' reasonable, investment-backed expectations in connection with the properties.[19] This factor, too, presents a

---

[18]    The record does not reveal the rent paid by the other occupants of the buildings. It is possible that the other rent-controlled tenants have lived in their units for decades and consequently pay extremely low rents and that Puente and Gracesqui's higher rents make up an unexpectedly high proportion of the total rent for the building. Plaintiffs do not argue that this is the case, however, so I assume that the other tenants in each building pay rents similar to Puente and Gracesqui's rent.

[19]    Plaintiffs assert that this factor "takes precedence" in the *Penn Central* analysis (Opp. at 21), but "[i]nvestment-backed expectations, though important, are not talismanic under *Penn Central*." *Palazzolo v. Rhode Island*, 533 U.S. 606, 634 (2001) (O'Connor, J., concurring). They are but "one factor that points toward the answer to the question whether the application of a particular regulation to particular property 'goes too far.'" *Id.*

close question, but I conclude that, at least at the motion to dismiss stage, it adequately suggests a taking.

It is axiomatic that laws and regulations change, and there is no general right to governmental consistency over time. "[D]istinct, investment-backed expectations are reasonable only if they take into account the power of the state to regulate in the public interest." *Pace Res., Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1033 (3d Cir. 1987). As Justice O'Connor once put it in in a concurrence, however, "the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those expectations." *Palazzolo v. Rhode Island*, 533 U.S. 606, 633 (2001) (O'Connor, J., concurring). Here, however, unlike in many takings-clause cases, plaintiffs do not claim that the law changed, defeating their expectations. Rather, they say that their investment was made in the expectation that the Board would follow the law as it existed, then and now. In short, the taking inhered in the Board's application of the law, not in the law itself.

Plaintiffs purchased the properties at issue, knowing they were subject to the rent control ordinance. They attempted to find out what the current tenants' permissible rents were, but the city failed to respond to their inquiries before they closed on the properties. (Am. Compl. ¶ 46–64.) Plaintiffs, however, were familiar with the city's rent control ordinances and presumably calculated that their investment would be profitable if they were able to charge the legal rents for the units. It should go without saying that one of any property owner's reasonable investment-backed expectations is the expectation that the government will follow the law. It is plausibly alleged that by refusing to follow the law, the Board interfered with plaintiffs' investment-backed expectations and thereby reduced the value of their properties. This second factor thus weighs more heavily in favor of a taking.

### 3. Character of the government action

"A taking may be more readily found when the interference with property can be characterized as a physical invasion by government . . . than when the interference arises from some public program adjusting the benefits and

31

burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124; *Midnight Sessions, Ltd. v. City of Philadelphia*, 945 F.2d 667, 676 (3d Cir. 1991), *abrogated on other grounds by United Artists Theatre Cir.*, 316 F.3d 392. Thus, "in instances in which a state tribunal reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land, this Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests." *Penn Central*, 438 U.S. at 125. This factor flows from the underlying principle that "fairness and justice" require that public burdens be borne by the public as a whole, rather than shifted to individuals. *Armstrong v. United States*, 364 U.S. 40, 49 (1960). In addition, "if the law at issue 'applies generally to a broad class of properties,' a court is likely to find that no taking has occurred." *Sutton v. Chanceford Twp.*, 186 F. Supp. 3d 342, 349 (M.D. Pa. 2016) (quoting *Rogin*, 616 F.2d at 690).

Here, plaintiffs argue that defendants acted unlawfully and in bad faith. The challenged actions were not duly enacted changes to a generally applicable regulatory scheme, but adjudications that applied specifically to defendants, and indeed to particular apartments. The Amended Complaint does allege a pattern of lawlessness and a refusal by the Board to accept clear evidence and to follow the applicable regulations. The actions of the Board, it is alleged, did not aim to protect the public interest, but rather to slash the rents of two individual tenants. (Opp. at 24.)

The defendants, for their part, entirely ignore this element of the *Penn Central* test in their briefing. The Amended Complaint, however, quotes Salierno as stating that lowering Gracesqui's rent would serve the public interest by stabilizing rents in the city. (Am. Compl. ¶ 176.) It is not clear, however, how ignoring the terms of the rent control ordinance to lower Gracesqui and Puente's rent helps anyone other than Gracesqui and Puente. The defendants put forward no argument that these actions—as opposed to the

rent control ordinance in general—operate at the level of protecting the public interest.

The Supreme Court has recognized that bad faith on behalf of the government can weigh in favor of a taking. *See Tahoe-Sierra Pres. Council*, 535 U.S. at 333 (*citing City of Monterey v. Del Monte Dunes at Monterey, Ltd.* 526 U.S. 687, 698 (1999); *see also Wyatt v. United States*, 271 F.3d 1090, 1098 (Fed. Cir. 2001) (noting that bad faith is usually required to find that a permitting delay amounted to a taking). At this stage I must take the facts pleaded in the Amended Complaint as true, and those facts tend to show that the Board acted in bad faith and without regard for the law. Thus, the character of the government action weighs in favor of finding a taking.

Regulatory takings jurisprudence is characterized by "essentially ad hoc, factual inquiries." *Tahoe-Sierra*, 532 U.S. at 322 (quoting *Penn Central,* 438 U.S. at 124.) Much fact finding remains to be done in this case, but at this point I find that plaintiffs have plausibly alleged a taking under the *Penn Central* test. Although the diminution of the properties' value is not dramatic, the alleged bad faith of the Board weighs strongly in favor of denying defendants' motion to dismiss. To do otherwise would be to allow local governments to ignore the law and take property, so long as they only took a small amount each time. I therefore decline to dismiss Count 4.

### H. Actions in Lieu of prerogative writs

Plaintiffs' two remaining claims are actions in lieu of prerogative writs, brought solely against the Board to review its actions. The claim is derived from the New Jersey State Constitution, which preserved the substance of common law prerogative writ review by permitting parties to seek "review, hearing and relief" in the Superior Court of all actions of municipal agencies. N.J. Const. Art. VI, § 5, ¶ 4; *Rivkin*, 143 N.J. at 378. ("A court may set aside a municipal board decision if it is shown to be arbitrary, capricious or unreasonable, not supported in the evidence, or otherwise contrary to law.") This provision is implemented by New Jersey Court Rule 4:69-1 which provides "[r]eview,

hearing and relief heretofore available by prerogative writs … shall be afforded by an action in the Law Division, Civil Part, of the Superior Court."

Although such actions are usually brought in New Jersey Superior Court, as contemplated in the Court Rule, federal courts have occasionally heard them under their supplemental jurisdiction. *See, e.g.*, *Nat'l Amusements, Inc. v. Borough of Palmyra*, 843 F. Supp. 2d 538, 546–47 (D.N.J. 2012), aff'd, 716 F.3d 57 (3d Cir. 2013); *Mendez v. Port Auth. of New York & New Jersey*, No. CV 14-7543 (ES), 2017 WL 1197784, at *10 (D.N.J. Mar. 31, 2017). Defendants do not move to dismiss the actions in lieu of prerogative writs. I will maintain supplemental jurisdiction over them, as they form part of the same case or controversy as the plaintiffs' taking claim. 42 U.S.C. § 1367(a). Indeed. They lie at the heart of what this case is truly about, and may be prioritized for purposes of discovery and trial, if appropriate.

## IV.    CONCLUSION

For the reasons set forth above, defendants' motions to dismiss are GRANTED in part and DENIED in part. First, defendants' motion (DE 30) is GRANTED with regard to Plaintiffs The Stella on Park, LLC, Golden Crest 3347 Park Avenue, LLC, OM 422-426 5th Street, LLC, OM-309-315 11th Street, LLC, and OM-812 New York Avenue, LLC and they are dismissed entirely from the case for lack of standing. In addition, defendants' motion (DE 30) is GRANTED with regard to Counts 1, 2, and 3, but DENIED with regard to Count 4, 5, and 6. Because only Counts 1, 2, and 3 are pleaded against the individual defendants, all individual defendants are also dismissed from the case. Salierno and Marotta's motions to dismiss (DE 31, 32) are therefore **DENIED as moot** because they have been dismissed from the case as a result of my decision on the primary motion to dismiss (DE 30).

Of the three remaining claims, Count 4 is pleaded against the City of Union City and Counts 5 and 6 are pleaded against the Board. Thus, the remaining plaintiffs are 6th Street LLC and Palisade Avenue LLC and the remaining defendants are the City of Union City and the Union City Rent Leveling Board, all other parties are terminated.

34

A separate order will issue.

Dated: March 23, 2022

/s/ Kevin McNulty
_____
**Hon. Kevin McNulty**
**United States District Judge**